Nancy KOSAKOW, Plaintiff–Appellant,

v.

NEW ROCHELLE RADIOLOGY ASSOCIATES, P.C., Defendant–Appellee.

Docket No. 00–7392.

United States Court of Appeals, Second Circuit.

Argued April 4, 2001.

Decided Dec. 20, 2001.

William D. Frumkin, Sapir & Frumkin LLP, White Plains, NY, for Plaintiff–Appellant.

Jordy Rabinowitz, Garfunkel, Wild & Travis, P.C., Great Neck, NY, for Defendant–Appellee.

Henry L. Solano, Solicitor of Labor U.S. Department of Labor, Washington, DC, (Allen H. Feldman, Nathaniel I. Spiller, and Elizabeth Hopkins on the brief) for Amicus Curiae United States Supporting Plaintiff–Appellant.

Eugene Prosnitz, Bronx, NY, for Amicus Curiae New York Chapter of the National Employment Lawyers' Association.

Ann Elizabeth Reesman, McGuiness Norris & Williams LLP, Washington, DC, for Amicus Curiae Equal Employment Advisory Council in Support of Defendant–Appellee.*

Before: CABRANES and KEARSE, Circuit Judges, and TRAGER, District Judge.

TRAGER, District Judge.

Plaintiff–Appellant, Nancy Kosakow ("Kosakow"), brings this appeal from the grant of summary judgment in favor of Defendant–Appellee, New Rochelle Radiology Associates, P.C. ("New Rochelle"). Kosakow brought this action pursuant to the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq.* (the "FMLA"), alleging that New Rochelle, her employer, failed to reinstate her to her position after she had taken protected leave under the FMLA. Kosakow further alleges that she did not receive severance pay to which she was entitled, in violation of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA").

## Background

### (1)

Nancy Kosakow was employed by New Rochelle as a part-time "radiological technologist" from July of 1978 until March of 1997. In June of 1996, Kosakow learned that she had a possibly cancerous cystic mass in her left ovary. In November of 1996, after learning that the mass had not diminished in size, she scheduled surgery for January 14, 1997, to remove it. Shortly after this surgery was scheduled, Kosakow notified her manager, Gale Gluss, and was granted medical leave for the operation, as well as time for recovery after the surgery.

Kosakow continued to work through January 10, 1997. The surgery took place on January 14, 1997, as scheduled, and Kosakow remained on medical leave there-

after. In or about mid-Febrary of 1997, Kosakow informed New Rochelle that she would be medically cleared to return to work on March 17, 1997. On March 6, 1997, however, Gluss informed Kosakow that her position had been eliminated as a result of downsizing, and, consequently, Kosakow had been terminated.

Feeling that she had been terminated due to her medical problems, Kosakow filed a pro se discrimination charge with the New York State Division of Human Rights (the "DHR"), alleging violations of the New York Human Rights Law ("NYHRL"). In the complaint, Kosakow also alleged that New Rochelle had violated the Americans with Disabilities Act (the "ADA"), and authorized the DHR to accept the complaint on behalf of the Equal Employment Opportunity Commission ("EEOC"). New Rochelle responded by filing a Narrative Reply with the DHR, to which Kosakow filed a Rebuttal. On August 24, 1998, after an investigation of the matter, DHR issued its determination that there was "no probable cause to believe that [New Rochelle] has engaged in or is engaging in the unlawful discriminatory practice complained of." In so finding, DHR credited New Rochelle's explanation that Kosakow's position was eliminated for legitimate business reasons. This finding was subsequently adopted by the EEOC without independent review, and the EEOC issued Kosakow a right-to-sue letter on October 13, 1998.

Kosakow did not seek review of this determination in state court, as she was entitled to under Article 78 of New York Civil Practice Law. *See* N.Y. C.P.L.R. § 7801 (McKinney's 1994). Nor did she pursue her claims under the ADA in federal court within the ninety days required by the statute. *See* 42 U.S.C. §§ 12117(a) (adopting Title VII limitations period for the ADA), 2000e–5(f) (requiring that action

* The Honorable David G. Trager of the United States District Court for the Eastern District of New York, sitting by designation.

must be brought within ninety days of notification of right to sue). Instead, after this time had expired, Kosakow retained counsel and filed the present suit, alleging that New Rochelle's actions violated her rights under the FMLA and ERISA.

(2)

The district court granted New Rochelle's motion for summary judgment as to Kosakow's FMLA claim on March 13, 2000. The court initially held that Kosakow did not meet the minimum hours required to be an "eligible employee" under the FMLA, but had raised a genuine issue of material fact as to whether New Rochelle was estopped from raising an eligibility defense due to its failure to post the required FMLA eligibility notice. *Kosakow v. New Rochelle Radiology Assocs., P.C.,* 88 F.Supp.2d 199, 205–09 (S.D.N.Y. 2000). Nonetheless, the court held that Kosakow was collaterally estopped from pursuing an FMLA claim as a result of DHR's determination that there was no probable cause that New Rochelle acted for discriminatory reasons. *Id.* at 209–14.

With respect to Kosakow's ERISA claim, the district court found that New Rochelle had a "plan" that was covered by ERISA, but that the plan administrator had not officially determined whether she was entitled to severance pay. *Id.* at 216. Consequently, the district court remanded Kosakow's ERISA claim to the plan administrator so that determination could be made. *Id.* After the remand, the plan administrator denied Kosakow severance pay, determining that she had not been "terminated," as defined by the plan, and, even if she were, she was not entitled to severance pay. That determination was upheld in part by a subsequent Memorandum Decision by the district court. *Kosakow v. New Rochelle Radiology Assocs., P.C.,* 116 F.Supp.2d 400 (S.D.N.Y.2000).

Kosakow now appeals from the district court's original determination that she did not satisfy the minimum hours eligibility requirement under the FMLA, as well as the holding that she was collaterally estopped from bringing her FMLA claim. In addition, Kosakow appeals from the district court's subsequent holding that she is not entitled to severance pay.

As alternative bases for affirmance, appellee New Rochelle challenges several determinations by the district court, most of which, if New Rochelle is correct, would require dismissal of one of Kosakow's claims. First, it challenges the court's holding that questions of fact exist with respect to the start date of Kosakow's leave and whether the hours Kosakow spent at various continuing education programs count towards her FMLA eligibility. Next, New Rochelle disputes the district court's holding that Kosakow may state a claim under the FMLA, regardless of whether she is "eligible," because New Rochelle failed to post required FMLA notices. Finally, New Rochelle contends that the district court erred in determining that Kosakow's employee handbook created a "plan" under ERISA which potentially could have entitled Kosakow to severance pay.

Kosakow argues that because New Rochelle failed to file a notice of cross-appeal, it has no right to attack the district court's decision on these, or any other, grounds. Although it has long been the law that an appellee who has failed to file a notice of cross-appeal cannot "attack the decree with a view either to enlarging his own rights thereunder or of lessening the rights of his adversary." *Burgo v. Gen. Dynamics Corp.,* 122 F.3d 140, 145 (2d Cir.1997) (quoting *Morley Constr. Co. v. Maryland Cas. Co.,* 300 U.S. 185, 191, 57 S.Ct. 325, 328, 81 L.Ed. 593 (1937) (Cardozo, J.)), in the present case New Rochelle

is not "attacking the decree" of the district court. Indeed, the district court granted summary judgment in favor of New Rochelle with respect to both of Kosakow's claims. Thus, what New Rochelle is arguing is that, even if the district court is reversed on one or more of the grounds urged by Kosakow, there are alternative grounds upon which the grant of summary judgment can be affirmed. In such a situation, because an appellee can seek to sustain a judgment on any ground with support in the record, it is not necessary that the appellee file a notice of cross-appeal. *See Int'l Ore & Fertilizer Corp. v. SGS Control Servs., Inc.,* 38 F.3d 1279, 1285–86 (2d Cir.1994).

## Discussion

### (1)

### FMLA Eligibility

In order to be eligible for protection under the FMLA, an employee must work 1250 hours in the twelve months prior to the beginning of his or her medical leave. 29 U.S.C. § 2611(2)(A). Kosakow recorded her hours on timesheets, which she signed. There is no dispute that Kosakow's timesheets reflect that she was only paid for 1,186.5 hours during the twelve months prior to her leave, assuming that the first day of her leave is deemed to be the day of her operation, January 14, 1997. The district court held that questions of fact existed, however, concerning the starting date of Kosakow's leave and whether hours Kosakow spent at continuing education seminars (which were not included on her timesheets) could be counted toward her hours worked. *Kosakow,* 88 F.Supp.2d at 206–08. Accordingly, drawing all inferences in favor of Kosakow, the district court held that these two categories could potentially raise the total hours Kosakow worked in the relevant time frame to 1221.5 hours, 28.5 hours short of the 1250 hour requirement. *Id.* at 208–09.

Because the court determined that Kosakow was not entitled to include 38.75 hours she claims she worked during the relevant twelve months by coming in fifteen minutes before her start time each shift, the court held that she failed to reach the 1250 hour requirement. *Id.* Kosakow appeals from the district court's holding that the 38.75 total hours she spent at work prior to her shift cannot be counted toward her hours worked.

### a. Kosakow's Early Arrival

Kosakow argues that it was necessary for her to arrive at work fifteen minutes before her start time, and these additional fifteen minutes each day should be included in her hours worked. Her early arrival was necessary, she contends, because New Rochelle was open to accept walk-in patients at 8:00 a.m., and the office policy was to be ready to serve those patients when they arrived. In order to accomplish this, Kosakow needed to turn on the x-ray processing machine, allow it to warm up, perform tests on the machine, and help to prepare the office for receiving patients by pulling client files and preparing and performing pre-testing procedures for certain tests. She claims that this process took her approximately 15 minutes, and, accordingly, she arrived at 7:45 a.m. each morning instead of 8:00 a.m. *Id.* This additional time, if it is included in her hours worked for the year in question, would add 38.75 hours.

The district court held that this time should not be included in Kosakow's hours worked for three reasons: 1) Kosakow had not presented sufficient evidence to allow a jury to reasonably find that she actually arrived at 7:45 a.m. each morning; 2) even if she did come in at 7:45 a.m., these fifteen minutes each day cannot be included in her hours worked pursuant to the Portal–to–Portal Act, 29 U.S.C. § 254, be-

cause it is merely "preliminary," non-compensable time spent at work; and 3) assuming that she did arrive fifteen minutes early each day, this extra time was properly excluded from her work time as "de minimis." *Kosakow*, 88 F.Supp.2d at 206–07. Each of these points is examined below.

### 1. Sufficiency of Kosakow's Evidence

█ The district court held that no reasonable juror could give credence to Kosakow's naked assertion that she came to work fifteen minutes early every day. In so holding, the court noted that she had signed bi-weekly timesheets which indicated that she started work at 8:00 a.m., not 7:45 a.m., and that this documentary evidence could not be contradicted solely by Kosakow's otherwise unsupported allegation to the contrary. *Id.* at 207. In addition to these timesheets, New Rochelle points out that one former and four current radiological technicians submitted affidavits, each stating that they were never "required by Gale Gluss [the office manager at New Rochelle] or any Practice Administrator to report to work earlier than" their 8:00 a.m. scheduled shift time. New Rochelle also supports this claim with various statements by Kosakow in her deposition where she concedes that her timesheets were accurate, a statement in the employee handbook that employees were required to be at their stations at the time of their shift (i.e. not fifteen minutes early), and documents showing that patients rarely arrived before 8:30 a.m.

Kosakow counters this evidence with her own affidavit, as well as affidavits from two former receptionists at New Rochelle. In Kosakow's affidavit, she describes the various duties listed above which she completed to ensure the office was ready to receive patients at 8:00 a.m. This argument is bolstered by the two former receptionists, both of whom testify in their respective affidavits that Kosakow, as well as other radiological technologists, would arrive ten to twenty minutes prior to the 8:00 a.m. shift time in order to prepare the office.

The district court found that Kosakow's testimony did not create a genuine issue of material fact with respect to her arrival time each morning. *See Kosakow*, 88 F.Supp.2d at 206–07. Notably, the district court did not mention, and apparently did not consider, the affidavits of the former receptionists. Instead, the court relied exclusively on the timesheets filled out by Kosakow, and held that she offered no concrete evidence to indicate that these timesheets were inaccurate.

Kosakow is not, however, necessarily claiming that the timesheets were inaccurate. To be precise, she does not dispute that her shift began at 8:00 a.m., nor does she argue that the timesheets are inaccurate insofar as they reflect the fact that her pay was based upon her shift beginning at 8:00 a.m.[1] To the contrary, her claim is that in order to fulfill her job responsibilities, it was necessary that she arrive at 7:45 a.m. despite the fact that her shift did not begin until 8:00 a.m. She argues that these fifteen minutes each morning should count towards her hours worked, despite the fact that they were not included in her paychecks or on her timesheets.

We conclude that questions of fact exist concerning whether Kosakow arrived at 7:45 a.m. each day and what functions she performed in the fifteen minutes before her shift. Kosakow and two former employees of New Rochelle with personal knowledge of Kosakow's daily activities

---

**1.** Because she is not actually challenging the documentary evidence, her affidavit alone should have been sufficient to create a genuine issue of fact.

and the functioning of the office all have testified that she did, in fact, come in early and begin preparing the office to accept patients. These affidavits are more than sufficient to create a question of fact as to this issue. The district court erred in resolving this factual issue on summary judgment.

### 2. Portal–to–Portal Act

The district court also held that, even assuming Kosakow did arrive fifteen minutes early to prepare the office, this time was properly excluded from her hours worked by the Portal–to–Portal Act. *See* 29 U.S.C. § 254. The FMLA derives its standards for calculating hours of service from the Fair Labor Standards Act (the "FLSA"). *See* 29 U.S.C. § 2611(2)(C). The Portal–to–Portal Act modified the FLSA to provide that an employee need not be compensated for:

> activities which are preliminary to or postliminary to said principal activity or activities, which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities.

29 U.S.C. § 254(a)(2). Because the district court found that Kosakow's morning activities were not an "integral and indispensable part of her principal activity," it held that the Portal–to–Portal Act dictates that they be excluded from her hours worked under the FLSA. *Kosakow*, 88 F.Supp.2d at 207. Consequently, the court excluded this time from Kosakow's hours worked under the FMLA. *Id.*

The Portal–to–Portal Act was enacted in response to the Supreme Court's decision in *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946). In *Anderson*, the Court held that time an employee spent changing into work clothes and walking to his or her post within the work facility was compensable time under the FLSA. *Id.* at 691–93, 66 S.Ct. at 1194–95. Because Congress felt that this decision was too liberal a construction of the FLSA and created too great a retroactive liability on employers, Congress enacted the Portal–to–Portal Act to eliminate such "preliminary" and "postliminary" activities from the definition of compensable time under the FLSA. *See Reich v. New York City Transit Auth.*, 45 F.3d 646, 648–49 (2d Cir.1995).

In 1956, the Supreme Court decided two cases on the same day interpreting the reach of the Portal–to–Portal Act. These cases still serve as the guide to what activities are considered "preliminary" or "postliminary" as opposed to "principal" work activities. In *Steiner v. Mitchell*, 350 U.S. 247, 76 S.Ct. 330, 100 L.Ed. 267 (1956), the Court addressed the issue of whether the FLSA required compensation for workers in a battery plant for time spent at the beginning of each shift changing into work clothing and, at the end of each shift, showering and changing out of that clothing. *Id.* at 248, 76 S.Ct. at 331. The Court recognized that normally changing and showering before or after work would be excluded by the Portal–to–Portal Act but held that where that activity was "an integral and indispensable part of the principal activity of the employment," the employee must be compensated for it. *Id.* at 256, 76 S.Ct. at 335. Because the employees in *Steiner* were exposed to large amounts of lead dust at the plant, it was necessary for safety reasons that they change clothes before work, and shower and change back after work. The Court held that these activities were covered under the FLSA because they were an integral and indispensable part of working in the battery plant, and were, accordingly, not simply "preliminary" or "postliminary" under the Portal–to–Portal Act. *Id.*

That same day, the Court decided *Mitchell v. King Packing Co.*, 350 U.S. 260, 76 S.Ct. 337, 100 L.Ed. 282 (1956). In *Mitchell*, employees of a meat packing company argued that, pursuant to the FLSA, they should be compensated for time spent before or after their shift sharpening their knives. *Id.* at 261–62, 76 S.Ct. at 339. Because the proper and efficient performance of their work required that the knives be "razor sharp," the Court held that the sharpening of the knives was "an integral part of and indispensable to the various butchering activities for which they were principally employed." *Id.* at 262–63, 76 S.Ct. at 339. Consequently, the Court held that the employees were entitled to compensation for those activities despite the fact that they were performed outside of their scheduled work hours. *Id.* at 263, 76 S.Ct. at 339.

*Steiner*, and even more so, *Mitchell*, compel the conclusion that Kosakow is entitled to compensation for her morning activities under the FLSA, notwithstanding the Portal–to–Portal Act. There is no real dispute that the duties she describes were necessary for the proper performance of her job. Rather, New Rochelle disputes whether Kosakow needed to perform these duties prior to 8:00 a.m. In this connection, Kosakow argues that she needed to begin these tasks at 7:45 a.m. so that the office would be ready promptly at 8:00 a.m. in the event that a walk-in patient arrived at that time. While New Rochelle counters by claiming that patients were never scheduled before 8:15 a.m., and walk-ins never arrived at 8:00 a.m., the latter claim is contradicted by New Rochelle's own evidence. All four of the affidavits filed by radiological technologists in support of New Rochelle's motion for summary judgment testified that walk-ins "infrequently arrived for treatment prior to 8:30 a.m. (and almost never at 8:00 a.m. sharp when our doors first opened)." The fact that these technologists concede that

walk-in patients would occasionally arrive at 8:00 a.m. supports Kosakow's claim that the office had to be ready by that time.

■ The testimony from these radiological technologists that they were never expressly "required" to arrive prior to 8:00 a.m. by their supervisors does not change this result. If the proper performance of their job required the preparatory work to be completed when the first walk-in patient could potentially arrive, this time should have been counted, regardless of whether anybody specifically instructed them to arrive early. *See generally Mitchell*, 350 U.S. 260, 76 S.Ct. 337, 100 L.Ed. 282.

Moreover, pursuant to a regulation promulgated under the FLSA, an employee must be compensated for time she works outside of her scheduled shift, even if the employer did not ask that the employee work during that time, so long as the employer "knows or has reason to believe that [the employee] is continuing to work" and that work was "suffered or permitted" by the employer. *See* 29 C.F.R. § 785.11. The evidence described above is sufficient for a jury to find that New Rochelle knew or had reason to know that Kosakow arrived early each morning in order to work, and permitted her to do so. Accordingly, this time would be included in Kosakow's hours worked.

■ In sum, drawing all inferences in Kosakow's favor, questions of material fact exist as to whether it was necessary for her to complete her preparatory activities by 8:00 a.m. Because a fact-finder could conclude that these activities were "an integral part of and indispensable to" the activities for which Kosakow was principally employed, this time may be compensable under the FLSA, notwithstanding the Portal–to–Portal Act. *Mitchell*, 350 U.S. at 263, 76 S.Ct. at 339. Accordingly, the

district court erred in granting summary judgment on this ground.

### 3. De minimis

■ The final ground upon which the district court based its determination that Kosakow was not entitled to include her morning preparation in her hours worked is that the time was properly excluded as de minimis. *Kosakow*, 88 F.Supp.2d at 207 (citing *Reich*, 45 F.3d at 652–53). *Reich* held that time spent by transit police charged with the care of police dogs was de minimis where that time was limited to restraining (and occasionally walking) the dogs during the officer's commute to or from work. *Id.* In so holding, *Reich* adopted the three-part test set forth by the Ninth Circuit, holding that factors to be considered in determining whether time should be excluded from compensation as de minimis were: "(1) the practical administrative difficulty of recording the additional time; (2) the size of the claim in the aggregate; and (3) whether 'the claimants performed the work on a regular basis.'" *Id.* at 652 (quoting *Lindow v. United States*, 738 F.2d 1057, 1063 (9th Cir.1984)).

■ Applying these factors to the present case, Kosakow's fifteen minutes of preparatory work each morning are not properly excluded as de minimis. Initially, the time in question in *Reich* is distinguishable from the time worked by Kosakow. The transit police in *Reich* spent only a couple of minutes when it was necessary to discipline or walk their dogs, and, more importantly, this was an extremely infrequent occurrence on the whole. *Id.* at 652–53; *see also id.* at 648 n. 3 (noting that testimony varied from no stops during the previous year to twenty stops per year). In contrast, Kosakow claims that her early arrival was necessary for the office to be

ready to receive patients by 8:00 a.m. *every* day, and, consequently, she would arrive at 7:45 a.m. each day she worked. As already stated, a question of fact exists as to whether Kosakow in fact arrived at 7:45 a.m. each morning, but, if she did, this regular arrival for fifteen minutes of preparatory work would not constitute de minimis activity. It would not be difficult to calculate, in the aggregate it constituted a significant amount of time, and it occurred regularly. *Cf. Reich*, 45 F.3d at 652. Accordingly, the district court erred in holding that this time was excludable as de minimis.

In sum, none of the three grounds upon which the district court relied are sustainable. Accordingly, we conclude that the district court erred in holding that, as a matter of law, the fifteen minutes Kosakow worked each morning could not be included in her hours worked under the FMLA.

### b. Date of Leave

■ New Rochelle also challenges the district court's determination that questions of fact existed as to whether January 11, 1997, was the starting date of Kosakow's leave, not January 14, 1997, the date of her operation. If Kosakow is correct that the starting date was January 11, 1997, then the twelve months prior to the start of her leave would include January 11, 1996 and January 12, 1996. On each of these dates, she was paid for eight hours of work, and, accordingly, her total hours worked would increase by sixteen hours.[2]

Kosakow testified that she informed her employer that her last day of work before her operation would be Friday, January 10, 1997. In addition, it is not disputed that Kosakow was often scheduled to work on Saturdays, but she did not work on

---

**2.** This number would be 16.5 hours if Kosakow is able to establish that she did arrive each morning at 7:45 a.m.

Saturday, January 11, 1997. In reviewing this evidence, the district court concluded that a question of fact existed as to whether it was possible that Kosakow would have been scheduled to work on Saturday, January 11, 1997, if she had not informed New Rochelle that her last day of work would be January 10, 1997. Accordingly, if it were possible she would have been scheduled on January 11, 1997, then that was her first day off from work, and thus was the start date of her leave.

New Rochelle argues that there was no possibility that Kosakow would have been scheduled to work on Saturday, January 11, 1997, and, therefore, her leave did not begin until Monday, January 14, 1997. In support of this argument, New Rochelle points out that Kosakow was generally only scheduled to work every third Saturday and was never scheduled to work two Saturdays in a row. Because she worked the previous Saturday (January 4, 1997), New Rochelle contends, no juror could reasonably conclude that she might have been scheduled to work on January 11, 1997 had she not informed New Rochelle that January 10, 1997 would be her last day.[3]

New Rochelle's argument is not without force, but, ultimately, it cannot be said that no reasonable juror could credit Kosakow's position. Kosakow's Saturday work schedule was not so regular such that it is inconceivable that she may have been scheduled to work on January 11, 1997. While generally she did work every third Saturday, on occasion she worked every other Saturday. Moreover, notwithstanding New Rochelle's assertion to the contrary, on at least one occasion in the year in question she was scheduled to work on consecutive Saturdays. The district court

did not err in holding that these irregularities, combined with Kosakow's testimony that she informed New Rochelle that her last day would be January 10, 1997, would allow a reasonable juror to conclude that, had she not requested time off, she may have been scheduled to work on Saturday, January 11, 1997. If so, then her leave began on January 11, 1997. Accordingly, the district court was correct in holding that a question of fact exists as to whether the sixteen hours Kosakow worked on January 11 and 12, 1996, should be counted toward her eligibility under the FMLA.

### c. Hours Spent at Continuing Education Courses

The district court also determined that Kosakow had raised questions of fact concerning whether 18.5 hours spent in attending, and traveling to and from, continuing education courses provided by the American Registry of Radiologic Technologists ("ARRT") should be included in her total hours worked in the year prior to her medical leave. Specifically, the district court held that questions of fact remained as to the number of hours Kosakow spent at these seminars, as well as the exact nature of the seminars. *Kosakow*, 88 F.Supp.2d at 208. New Rochelle challenges this determination, arguing that these hours should not count toward Kosakow's eligibility under the FMLA.

Because the FMLA derives its standards for calculating hours of service from Section 7 of the FLSA, the question whether time spent at training seminars should count toward an employee's eligibility under the FMLA is governed by the FLSA. *See* 29 U.S.C. § 2611(2)(C). Pursuant to regulations promulgated under

---

**3.** It should be noted that New Rochelle includes this argument in its "counterstatement of the facts," but neglects to include any argument regarding, or even reference to, the dis-

trict court's holding with respect to these hours in the discussion portion of its brief. Nevertheless, its position is clearly stated in the facts section, and is addressed here.

the FLSA, the time that an employee spends at "lectures, meetings, training programs and similar activities" need not be counted toward that employee's hours worked where:

[1.] Attendance is outside of the employee's regular working hours;

[2.] Attendance is in fact voluntary;

[3.] The course, lecture, or meeting is not directly related to the employee's job; and

[4.] The employee does not perform any productive work during such attendance.

29 C.F.R. § 785.27.

New Rochelle argues that the above criteria are met. Because the first and fourth elements are not disputed, the parties focus on whether the continuing education courses were voluntary and whether they were related to Kosakow's job. In particular, New Rochelle relies on 29 C.F.R. § 785.30, a regulation related to the third element above, which provides:

Of course, if an employee on his own initiative attends an independent school, college or independent trade school after hours, the time is not hours worked for his employer even if the courses are related to his job.

29 C.F.R. § 785.30.

This regulation has been interpreted by the Department of Labor (the "DOL") in two opinion letters. *See* Opinion Letter from Dept. of Labor, Wage and Hour Div. (Sept. 15, 1997), 1997 WL 998038; Opinion Letter from Dept. of Labor, Wage and Hour Div. (Sept. 9, 1996), 1996 WL 1031798. In both letters, the DOL addressed the question of whether time spent by employees in training seminars or classes required by state licensing regulations was compensable under the FLSA. The DOL advised that where the training is required by the employer, the second element in 29 C.F.R. § 785.27, namely, voluntariness, would not be met because

this would not be "voluntary" with respect to the employee. *See* Opinion Letter from Dept. of Labor, Wage and Hour Div. (Sept. 9, 1996), 1996 WL 1031798. On the other hand, seminars or classes required by the state for individual licensing in the employee's field would be considered voluntary. *Id.*

Similarly, the DOL recognized that 29 C.F.R. § 785.30 mandates that the third element need not be met where an employee, on his or her own initiative, attends training at an independent school. Pursuant to this regulation, the DOL advised that attendance at training of general applicability which "enables the individual to gain or continue employment with any employer" need not be compensated. *See* Opinion Letter from Dept. of Labor, Wage and Hour Div. (Sept. 9, 1996), 1996 WL 1031798. An important consideration in making this determination is whether the state regulation imposed the licensing requirement on the employer or the individual employee. In the former instance it is more likely that the time must be compensated; in the latter it is less likely. *Id.*

New Rochelle argues that the time Kosakow spent at the radiologist continuing education seminars is indistinguishable from time spent at the state-required training described in the two opinion letters. As such, New Rochelle contends the time spent at these seminars need not be compensated pursuant to the FLSA, and, accordingly, would not be included in determining Kosakow's eligibility under the FMLA.

Kosakow counters by pointing out that New Rochelle specifically required that she maintain ARRT certification, and that ARRT certification requires her attendance at continuing education courses. Thus, she contends, her attendance at these courses was not voluntary. Moreover, Kosakow argues, New Rochelle of-

fered to pay expenses which "relate[d] directly to the employee's position or provide[d] beneficial information to be shared in the employee's department." Indeed, it appears that New Rochelle enrolled Kosakow in these continuing education courses, paid Kosakow for 1.5 hours she spent at one such seminar, and paid her tuition and registration fees. *Kosakow*, 88 F.Supp.2d at 207.

■ We find no statute or regulation requiring that radiologists be certified by the ARRT, or that radiologists attend continuing education seminars.[4] New York requires all applicants for a licensure as radiologic technologists in New York to pass a written examination. N.Y. Pub. Health Law § 3506(1) (McKinney's 1985). To be sure, an applicant may be able to qualify by submitting evidence that she has passed a similar test offered by ARRT, *id.* § 3506(5), but it does not appear, and New Rochelle does not claim, that there is any state requirement that radiologic technicians be certified by ARRT. If Kosakow is able to prove that she was attending these courses as a requirement of her employer, not because she was required to do so by the state, then the attendance would not be considered "voluntary," and thus must be compensated under the FLSA. *See* 29 C.F.R. § 785.27. Accordingly, the district court did not err in holding that issues of fact remained concerning whether Kosakow's attendance at these seminars was voluntary.

In sum, questions of fact exist with respect to all three categories of hours Kosakow claims beyond the time reflected on her timesheets. If these questions are

resolved in her favor, she will have worked 1259.75 hours in the twelve months prior to her leave, and would consequently be an eligible employee under the FMLA.

### (2)

### Equitable Estoppel

The district court further held that, even assuming Kosakow fails to establish that she met the minimum hours requirement of the FMLA, New Rochelle is estopped from challenging her eligibility due to its failure to post notices required by the FMLA. *Kosakow*, 88 F.Supp.2d at 209. New Rochelle argues that the FMLA is clear that only an employee who has worked 1250 hours in the twelve months prior to the start of her leave is eligible for FMLA protection, *see* 29 U.S.C. § 2611(2)(A), and, accordingly, Kosakow cannot state a claim under the FMLA because she simply cannot meet the definition of an "eligible employee." Moreover, New Rochelle argues she cannot be "deemed eligible" under 29 C.F.R. § 825.110(d) due to New Rochelle's failure to notify her of the FMLA requirements because such a determination would be in conflict with the clear statutory definition of an "eligible employee." *See Woodford v. Community Action of Greene County, Inc.*, 268 F.3d 51, 2001 WL 1191393, at *3 (2d Cir. Oct.10, 2001)(finding regulation invalid because it purported to extend eligibility to employee who had not met 1250 hour requirement); *see also Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 795–97 (11th Cir.2000) (same); *Dormeyer*

---

4. The record is sparse on this point, but our independent review of the relevant statutes and regulations does not reveal any requirement for continuing education for radiologic technologists, except in a very limited case that does not appear relevant here, 10 NYCRR § 89.5 (requiring a radiologist to have, *inter alia,* CPR training when assisting a

physician in an intravascular special radiographic procedure), and New Rochelle has not pointed to any such requirement. *See* N.Y. Pub. Health Law §§ 3500–18 (McKinney's 1985); 10 NYCRR §§ 89.1 89.50 (New York state regulation governing the use of radiographic technology).

*v. Comerica Bank–Illinois,* 223 F.3d 579, 582–83 (7th Cir.2000) (same).

New Rochelle's argument misses the mark. The district court did not find that Kosakow should be "deemed eligible" under the FMLA; it held that New Rochelle, by failing to comply with the notice requirements of the FMLA, was estopped from contesting Kosakow's eligibility. *See Kosakow,* 88 F.Supp.2d at 209. Accordingly, *Woodford, Brungart* and *Dormeyer* are inapposite. These cases invalidated 29 C.F.R. § 825.110(d), which purports to "deem[ ] eligible" an employee where "the employer fails to advise the employee of whether the employee is eligible [for FMLA leave] prior to the date the requested leave is to commence." 29 C.F.R. § 825.110(d). As *Woodford* pointed out, such a provision has the result of changing the statutory definition of who is an eligible employee, an effect that is beyond the authority of the Department of Labor. *See Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984); *see also Woodford,* 268 F.3d 51, 54. By its terms, the regulation would purport to "deem[ ] eligible" an employee who worked for only one hour solely because the employer failed to notify the employee that she was not eligible for FMLA protection. *See Dormeyer,* 223 F.3d at 582. So read, the regulation would create eligibility for an employee despite the fact that the lack of notice in no way contributed to the employee's ineligibility. Consequently, the regulation is invalid. *Woodford,* 268 F.3d 51, 57.

Kosakow does not simply rely on this regulation, however. Rather, Kosakow maintains that New Rochelle should be estopped from challenging her eligibility as a result of its misconduct in failing to fulfill its statutory duty to inform her of what she needed to do to become eligible. She contends that she relied on New Rochelle to inform her of her eligibility, and had the defendant fulfilled this duty, she would have worked the hours necessary to meet the eligibility requirements prior to undergoing her surgery. As in *Woodford,* under the right circumstances, equitable estoppel may be available to a plaintiff in Kosakow's position. *Woodford,* 268 F.3d 51, 57, n. 2.

The district court found that under these circumstances, New Rochelle is estopped from challenging Kosakow's eligibility. In so holding, the district court relied on *Fry v. First Fidelity Bancorporation,* No. Civ. A. 95–6019, 1996 WL 36910 (E.D.Pa.1996). *Fry* is not precisely on point, however. In *Fry,* there was no question that the employee met the 1250 hour requirement and was an eligible employee under the FMLA. The issues in *Fry* involved an employee who took a sixteen-week leave, based, she claimed, on the employer's failure to notify her that this leave would not be protected under the FMLA and on misleading notifications in the employee handbook. The district court held that an employer's failure to post required notices, in and of itself, can give rise to a claim of "interference with an employee's FMLA rights" where such failure causes the employee to "unwittingly forfeit the protection of the FMLA." *Id.* at *5. In other words, *Fry* stands for the proposition that, under the proper circumstances, a distinct cause of action lies for an employer's failure to post a notice where that failure leads to some injury. *Cf. Fulham v. HSBC Bank USA,* No. 99–CV–11054 (JGK), 2001 WL 1029051, at *7–8 (S.D.N.Y. Sept.6, 2001) (distinguishing cases where failure to notify properly a plaintiff of FMLA rights may violate plaintiff's FMLA rights); *see also Mora v. Chem–Tronics, Inc.,* 16 F.Supp.2d 1192, 1219–28 (S.D.Cal.1998) (following *Fry* ); *Mion v. Aftermarket Tool & Equip. Group,* 990 F.Supp. 535, 539 (W.D.Mich.

1997) (same); *Kruse v. Laguardia Hosp.*, 95–CV–4467 (JG), 1996 WL 1057147, at \*5 (E.D.N.Y. Nov. 6, 1996) (same). Accordingly, this proposition, and the validity of which we do not address here, is only applicable where the employee has the power to maintain a cause of action under the FMLA in the first instance.

■■■■ If Kosakow does not meet the 1250 hour requirement, however, she cannot take advantage of the reasoning in *Fry*. Even accepting for argument's sake that an "interference" cause of action exists for the employer's failure to post a required notice, as described in *Fry*, only an eligible employee is entitled to bring such an action. Specifically, *Fry* based liability on §§ 2615 and 2617 of the FMLA. Section 2615 provides that it "shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1). A private right of action is created for violation of § 2615 by § 2617(a)(1), which provides that "[a]ny employer who violates section 2615 of this title shall be liable to any *eligible employee* affected." 29 U.S.C. § 2617(a)(1) (emphasis added). As noted, there was no dispute in *Fry* that the employee was an "eligible employee" in that she had worked for at least twelve months prior to her leave and had accumulated at least 1250 hours. *Fry*, 1996 WL 36910, at \*1. As such, she was entitled to bring an interference claim under § 2617 based on the lack of notice. The same cannot be said of Kosakow. Consequently, Kosakow cannot state a *Fry* interference claim unless she is able to establish her eligibility.[5]

One district court in this circuit has extended the reasoning in *Fry* to confer eligibility upon an otherwise ineligible employee. *See LaCoparra v. Pergament Home Centers, Inc.*, 982 F.Supp. 213 (S.D.N.Y.1997). The court in *LaCoparra* held that an employee who failed to meet the 1250 hour requirement for eligibility under the FMLA may, nonetheless, state a cause of action for interference where the employee's ineligibility was caused by the employer's failure to provide notice. *Id.* at 219–220.

We disagree with this holding insofar as the court in *LaCoparra* failed to require that the plaintiff establish all of the elements of equitable estoppel. The FMLA does not provide a private right of action for any employee, only for "eligible employee[s]." 29 U.S.C. § 2617(a)(1). *LaCoparra* purports to create a cause of action under § 2617 even where the employee does not meet the statutory requirements of an eligible employee set forth under the FMLA. *See* 29 U.S.C. § 2611(2)(A) (eligibility requirements). The language of the statute does not permit this result.

■■■■ On the other hand, nothing prevents a court from exercising its equitable powers to estop a party from raising a particular claim or defense. The doctrine of equitable estoppel is a judicial doctrine of equity which operates apart from any underlying statutory scheme. If all the elements of equitable estoppel are met, an employer may be estopped from challenging an employee's eligibility as a result of the employer's misconduct in failing to post the required notice.

■■■■ Thus, the question becomes whether, assuming Kosakow does not prevail on her arguments that she has met the minimum 1250 hour requirement, New Rochelle should be equitably estopped from challenging her eligibility due to its failure

---

**5.** Of course, if Kosakow is able to establish her eligibility, there will be no need for her to pursue a *Fry* interference claim because she will simply pursue her reinstatement claim. Hence, *Fry* is simply not relevant to the present case.

to post required notices. Because this is an equitable estoppel claim under a federal statute, federal law principles of equitable estoppel are applicable. *See, e.g., Wall v. Constr. & Gen. Laborers' Union, Local 230*, 224 F.3d 168, 175–76 (2d Cir.2000).

■ The doctrine of equitable estoppel is properly invoked where the enforcement of the rights of one party would work an injustice upon the other party due to the latter's justifiable reliance upon the former's words or conduct. *See In re Ionosphere Clubs, Inc.*, 85 F.3d 992, 999 (2d Cir.1996). Under federal law, a party may be estopped from pursuing a claim or defense where: 1) the party to be estopped makes a misrepresentation of fact to the other party with reason to believe that the other party will rely upon it; 2) and the other party reasonably relies upon it; 3) to her detriment. *See Heckler v. Community Health Services of Crawford County, Inc.*, 467 U.S. 51, 59, 104 S.Ct. 2218, 2223, 81 L.Ed.2d 42 (1984) (citing Restatement (Second) of Torts § 894 (1979)); *Buttry v. Gen. Signal Corp.*, 68 F.3d 1488, 1493 (2d Cir.1995). Whether equitable estoppel applies in a given case is ultimately a question of fact. *Bennett v. United States Lines, Inc.*, 64 F.3d 62, 65 (2d Cir.1995).

■ There can be little doubt that Kosakow has raised a genuine issue of fact with respect to the second and third elements of equitable estoppel. Kosakow knew that she required surgery as of November 13, 1996, two months prior to the scheduled date of her operation. She argues that, had she been informed by New Rochelle that she needed to have accumulated 1250 hours of work in order that her leave be protected by the FMLA, as was their legal duty to inform her, she would

have made sure to work the necessary hours. Given the fact that, if she does fall short of the requirement at all, it will be by less than fifty hours, it would not be unreasonable to infer that she would have been able to ensure that she met the mandatory minimum prior to her surgery. Thus, she argues, she justifiably relied on New Rochelle for this information, which they did not provide, and she suffered a detriment as a result.

■ The first element-namely, did New Rochelle make a misrepresentation of fact-presents two issues that must be resolved. First, it is agreed by the parties that New Rochelle did not make any affirmative misrepresentation, it merely remained silent. Thus, the question is whether, in the present circumstances, silence can constitute an affirmative misrepresentation. The law has long been that where a party has a legal duty to speak, silence can constitute an affirmative "misrepresentation." *See United States v. Wynshaw*, 697 F.2d 85, 87 (2d Cir.1983); *see also LHLC Corp. v. Cluett, Peabody & Co., Inc.*, 842 F.2d 928, 932 (7th Cir.1988); *Katz v. Colonial Life Ins. Co.*, 951 F.Supp. 36, 41 (S.D.N.Y.1997).

■ In the present case, the FMLA imposes a legal duty upon the employer to inform its employees of the conditions that they must meet in order to be covered by the FMLA. *See* 29 U.S.C. § 2619. Moreover, an employer must notify an employee who plans to take medical leave whether her proposed leave is covered by the FMLA before the employee takes the leave. 29 C.F.R. § 825.110(d)[6]; *see also* 29 C.F.R. § 825.219(a) (employer must, prior to employee taking leave, notify em-

---

**6.** Again, we do not here address whether this regulation is valid insofar as it purports to make eligible an otherwise ineligible employee where the employer does not provide the appropriate notice. Notwithstanding the res-

olution of that issue, the regulation is certainly valid insofar as it simply requires the employer to notify the employee whether her proposed leave is covered by the FMLA.

ployee that employee is ineligible for FMLA protection because she is a "key employee"). Read together, these provisions indicate that an employee can generally assume that she is protected by the FMLA unless informed otherwise. Accordingly, an employer who remains silent when its employee announces that she plans to take medical leave is effectively misleading that employee into believing that she is protected by the FMLA. Under these circumstances, New Rochelle's silence in the face of its legal duty to inform Kosakow of her ineligibility is properly construed as an affirmative misrepresentation.

The second issue with respect to New Rochelle's alleged misrepresentation by silence is whether it is necessary that New Rochelle *intended* to mislead Kosakow by its silence. On occasion, our cases have stated that a party should not be estopped absent some evidence of "bad faith or deliberate misconduct" by that party. *Tadros v. Coleman*, 898 F.2d 10, 12 (2d Cir. 1990); *see also Cook v. Pan Amer. World Airways, Inc.*, 771 F.2d 635, 646–47 (2d Cir.1985) (finding no estoppel because no evidence showed "deliberate design" or actions that the party "should unmistakably have understood would cause the employee to delay filing his charge") (quoting *Price v. Litton Bus. Sys., Inc.*, 694 F.2d 963, 965 (4th Cir.1982)); *O'Malley v. GTE Service Corp.*, 758 F.2d 818, 822 (2d Cir.1985) (also relying on and quoting *Litton* ). In each of these cases, however, it appears that the party seeking the estoppel failed to present evidence of any misrepresentations, and it accordingly does not appear that the lack of intent was a dispositive factor in any of them. *Tadros*, 898 F.2d at 12; *Cook*, 771 F.2d at 647; *O'Malley*, 758 F.2d at 822. Moreover, our cases have generally not included any reference to intent when evaluating equitable estoppel claims under federal law, requiring only a "material" or "definite" misrepresentation. *See,*

*e.g., Wall*, 224 F.3d at 176 ("definite misrepresentation"); *Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 294 (2d Cir.1999) ("material misrepresentation"); *Buttry*, 68 F.3d at 1493 ("definite misrepresentation"); *Bennett*, 64 F.3d at 65 ("material misrepresentation"). This court has never directly addressed the question raised in the present case, namely, whether a material and definite misrepresentation, by silence or otherwise, without evidence of an intent to deceive, can satisfy the "material misrepresentation" element of an estoppel claim under federal law.

Our analysis is guided by the Supreme Court's decision in *Heckler*. In *Heckler*, the Court addressed the application of estoppel under federal law, and, in so doing, quoted and adopted the elements of estoppel set forth in § 894(1) of the Restatement (Second) of Torts. *Heckler*, 467 U.S. at 59, 104 S.Ct. at 2223. The Restatement, while requiring a "definite misrepresentation," does not require any intent to deceive by the party to be estopped. Restatement (Second) of Torts at § 894(1). In the Comment section, the Restatement makes clear that estoppel is appropriate even where "the one making the representation believes that his statement is true," and, moreover, "it is immaterial whether the person making the representation exercised due care in making the statement." Restatement (Second) of Torts, § 894(1), cmt. b. Because the Supreme Court adopted the Restatement's estoppel elements, those elements will be applied as fully explained in the Restatement. Accordingly, we hold that a party may be estopped where that party makes a definite misrepresentation (or, in the present case, a misrepresentation by silence) and had reason to believe the other party would rely upon it, regardless of whether the person making the representation intended to deceive.

The present case provides a sufficient basis for invoking the doctrine. New Rochelle was under a legal duty to inform its employees of the protections of the FMLA and what was required of its employees in order that they qualify for those protections. If New Rochelle failed to post the required notices or include the required information in its employee manual, then New Rochelle failed to fulfill this legal duty and would have deprived Kosakow of the opportunity to take her leave under the shelter of the FMLA. In such circumstances, it could not be argued that Kosakow had not met the requirements of the statute if this shortcoming were a result of New Rochelle's failure to relay those requirements to her. Kosakow's operation was not an emergency, but rather was long-planned and it would appear that there was no reason that it could not have been rescheduled. If these are the facts, the district court could conclude that New Rochelle is estopped from maintaining that Kosakow was ineligible for FMLA protection.

### (3)

### Collateral Estoppel

Having found that Kosakow may be entitled to FMLA protection, it must be determined whether she is, nonetheless, precluded from litigating her FMLA claim. Kosakow has already presented her case to the DHR, albeit under a different legal theory, and that agency determined that there was no probable cause to believe that her termination was the result of discrimination. Having chosen to make her claim before a state administrative agency, the district court held that Kosakow was precluded by collateral estoppel from now bringing an FMLA claim in district court based on the same facts and circumstances. This case presents an issue that has not been directly decided in this circuit. Specifically, does a determination of

no probable cause by the DHR, reached without a hearing and unreviewed in state court, preclude litigation of a subsequent claim in federal court based on the same events.

The analysis of this issue must begin with the Supreme Court's decision in *Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982). In *Kremer*, the Court addressed whether a no-probable-cause determination by the DHR that has been reviewed and affirmed by a state court has preclusive effect on a subsequent Title VII action. *Id.* at 463, 102 S.Ct. at 1888. The Court's inquiry focused on the interaction between Title VII and 28 U.S.C. § 1738, which mandates that federal courts "afford the same full faith and credit to state court judgments that would apply in the State's own courts." *Id.* at 462–63, 102 S.Ct. at 1887. The Court reasoned that, unless Title VII expressly or implicitly overruled § 1738, the New York state court affirmation of the agency's finding of no probable cause would preclude federal litigation based on the same facts. Finding no express or implicit repeal of § 1738 in Title VII, the Court held that the state court affirmation of the no-probable-cause determination was binding on the federal court, *id.* at 468 78, 102 S.Ct. at 1890–96, provided that the procedures followed in coming to that determination satisfied the minimum constitutional requirements of the due process clause. *Id.* at 481–82, 102 S.Ct. at 1897–98. After evaluating the process undertaken by the DHR, including subsequent review for abuse of discretion in state court, the Court held that the DHR proceeding satisfied the requirements of the due process clause. *Id.* at 482–85, 102 S.Ct. at 1898–99.

 The decision in *Kremer*, however, was founded on the role of the state court in affirming the no-probable-cause deter-

mination of the DHR. Indeed, § 1738 only requires that federal courts give full faith and credit to decisions of state *courts*, and has no application to the decisions of state administrative agencies. The respect that federal courts must give to decisions of state administrative agencies was addressed by the Supreme Court in *Univ. of Tenn. v. Elliott*, 478 U.S. 788, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986).

In *Elliott*, an employee of the University of Tennessee brought an action against the University, alleging that his discharge was racially motivated. *Id.* at 790, 106 S.Ct. at 3221-22. The employee was granted a full hearing, at which he was represented by counsel and was afforded the right to call and cross-examine witnesses. *See Elliott v. Univ. of Tenn.*, 766 F.2d 982, 985 (6th Cir.1985) (noting that Elliott's counsel questioned nearly one hundred witnesses at the hearing), *aff'd in part, rev'd in part, Univ. of Tenn. v. Elliott*, 478 U.S. 788, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986). At the close of this hearing, the administrative law judge determined that his termination was not motivated by racial animus. *Elliott*, 478 U.S. at 791, 106 S.Ct. 3220. The employee did not seek judicial review of that determination in state court, pursuing instead an action in federal court under Title VII and § 1983. *Id* . at 792, 106 S.Ct. 3220. Thus, the Supreme Court was presented with the question of what preclusive effect the federal court should give to the administrative determination.

The Court first addressed Elliott's claims under Title VII. Because Title VII expressly mandates that state administrative agency decisions be given only "substantial weight," the Court held that Congress did not intend the decisions of state agencies be given claim or issue preclusive effect in a Title VII case. *Elliott*, 478 U.S. at 795-96, 106 S.Ct. at 3224-25. Consequently, unreviewed decisions of state administrative agencies will not bar a subse-

quent *de novo* trial under Title VII in federal court.

Elliott's § 1983 claim presented a different question, however, because that statute does not expressly limit the weight given to the determinations of state administrative agencies. The Court held that, in § 1983 actions, the factual determinations of a state administrative agency, acting in a judicial capacity, are entitled to the same issue and claim preclusive effect in federal court that the agency's determinations would receive in the State's courts. *Elliott*, 478 U.S. at 798-99, 106 S.Ct. at 3226 (citing *United States v. Utah Const. & Mining Co.*, 384 U.S. 394, 421-22, 86 S.Ct. 1545, 1559-60 (1966)).

### a. Congressional intent in the FMLA

▇ Under *Elliott*, therefore, the threshold question that must be answered is whether, in enacting the FMLA, Congress expressly or implicitly limited the preclusive effect to be given to the determinations of state administrative agencies, as it did under Title VII. Interestingly, neither party addressed this issue, both proceeding under the assumption that Congress imposed no such limitation in the FMLA. Although the parties ultimately are correct that the FMLA does not limit the preclusive effect given to the findings of state administrative agencies, this important question of law should be addressed because it would be dispositive of New Rochelle's argument. Accordingly, we turn to the FMLA to analyze whether it places any such limitations on the preclusive effect of the findings by state administrative agencies.

▇ Unlike Title VII, the FMLA contains no express provision governing the weight to be given a state agency's factual determinations. The absence of such a provision does not, however, dictate that no such limitation exists. The Supreme

Court has found such limitations implicitly. For example, in *Astoria Fed. Sav. & Loan v. Solimino,* 501 U.S. 104, 111 S.Ct. 2166, 115 L.Ed.2d 96 (1991), the Supreme Court held that the Age Discrimination in Employment Act ("ADEA") implicitly deprived state administrative agency determinations of preclusive effect. *Id.* at 110–14, 111 S.Ct. at 2171–73. Specifically, the Court recognized that the ADEA mandates that, where state law forbids discrimination on the basis of age, a complainant may pursue a federal complaint only after completing proceedings under that state law. *Id.* at 110–11, 111 S.Ct. 2166. Finding that this provision implicitly contemplated federal review even after a state administrative decision, the Court held that Congress, in enacting the ADEA, intended that factual determinations of state administrative agencies not have preclusive effect in federal court. *Id.*

The FMLA contains no provision dealing with prior state administrative actions. Indeed, there is no indication of a Congressional intent anywhere in the FMLA to limit the preclusive effect of state administrative agency factual determinations. The issue is simply not addressed, and, accordingly, we cannot say definitively that Congress intended to limit the role that a state administrative agency's findings would play in a subsequent suit under the FMLA in federal court. Thus, the ultimate question must be addressed here— whether, under New York law, which governs the matter of collateral estoppel, *see Marrese v. Am. Acad. of Orthopaedic Surgeons,* 470 U.S. 373, 381–82, 105 S.Ct. 1327, 1332–33, 84 L.Ed.2d 274 (1985), the finding of no probable cause by the DHR precludes subsequent litigation of causes of action based on the same events, even where the claimant was not provided with a hearing and the no-probable-cause finding was not reviewed by a state court.

### b. Preclusive effect of the DHR determination

This court has addressed the issue of what preclusive effect the DHR's no-probable-cause determination should be given in federal court on several occasions. After *Elliott* was decided, this court turned to the issue of the preclusive effect of a DHR no-probable-cause determination in *DeCintio v. Westchester County Med. Ctr.,* 821 F.2d 111 (2d Cir.1987). The claimant in *DeCintio* was an employee who was suspended and ultimately terminated for allegedly violating the policies of the hospital which employed him. Prior to his termination, he participated in an administrative hearing, pursuant to New York Civil Service Law § 75, reviewing allegations of misconduct against him. The hearing officer recommended that DeCintio be terminated, and he subsequently was. DeCintio then challenged this termination by filing a complaint with the DHR, which found no probable cause to believe that his termination was the result of discrimination. *Id.* at 112–13.

DeCintio subsequently filed a suit in federal court, alleging violations of Title VII and § 1983. Following *Elliott, DeCintio* held that, because the DHR's determination was never reviewed in state *court,* DeCintio was entitled to a trial *de novo* in federal court with respect to his *Title VII claim. Id.* at 114–15. However, DeCintio's *§ 1983 claim* was precluded by his § 75 hearing and the determination of no probable cause by the DHR. *Id.* at 116–18.

Notably, DeCintio's retaliation claim, which he did not litigate at his § 75 hearing, was also precluded. *Id.* at 116–18. In so holding, however, the court recognized that DeCintio had the opportunity to litigate this claim at his § 75 hearing, but simply failed to do so. *Id.* at 116. Alternatively, his retaliation claim was precluded based solely on the no-probable-cause

determination of the DHR, notwithstanding the fact that he did not receive a full hearing on the issue. *Id.* at 116–18.

Finally, in *Kirkland v. Peekskill*, 828 F.2d 104, 108 (2d Cir.1987), it was determined that a no-probable-cause finding by the DHR would have preclusive effect on subsequent §§ 1981, 1983, 1985, and 1986 claims. The claimant in *Kirkland* sought state court review of the DHR determination, but was denied relief for failure to name a necessary party in his appeal. *Id.* at 109. The claimant was precluded from litigating his claims in federal court as a result of the DHR determination and the state court's dismissal of his appeal from that determination. *Id.* However, the court noted in *Kirkland* that the holding "does not stand solely on our view of New York State law with respect to the finality of ... [a DHR] finding of no probable cause." *Id.* Rather, the decision was supported by the fact that the claimant had sought review of the DHR determination in state court. *Id.* Thus, *Kirkland* does not directly address whether an unreviewed no-probable-cause determination by the DHR should have preclusive effect.

*DeCintio* and *Kirkland* both suggest that New York state courts would give preclusive effect to an unreviewed determination by the DHR, but neither opinion decisively answers the question presented in this case. In *DeCintio*, unlike the present case, the employee had a full § 75 hearing prior to his discharge. In addition, the employee in *DeCintio*, unlike the present case, conceded that he had "fleshed out" the issue in question in the DHR proceeding. *DeCintio*, 821 F.2d at 118. Moreover, in *Kirkland*, unlike the present case, the employee appealed the DHR's determination to state court. *Kirkland*, 828 F.2d at 109. Although both

opinions seem to contemplate that the respective decisions would have been the same even absent these differentiating factors, such a case has not been directly addressed by this court. In light of this, that question will be answered in this case, to wit, whether a determination of no probable cause by the DHR, absent a formal hearing and absent any subsequent review in state court, serves to preclude subsequent federal court litigation of an issue already decided by the DHR.

 The New York Court of Appeals [7] set forth what is required before invoking collateral estoppel in *Schwartz v. Public Adm'r*, 24 N.Y.2d 65, 298 N.Y.S.2d 955, 246 N.E.2d 725 (1969). *Schwartz* held that there must be an "identity of issue which has necessarily been decided in the prior action and is decisive of the present action," and the party to be estopped must have had a "full and fair opportunity to contest the decision now said to be controlling." *Id.* at 71, 298 N.Y.S.2d at 960, 246 N.E.2d 725. The burden of proving identity of the issue rests on the proponent of collateral estoppel, while the opponent bears the burden of proving that he or she did not have a full and fair opportunity to litigate the issue. *Id.* at 73, 298 N.Y.S.2d at 962, 246 N.E.2d 725.

### 1. Identity of Issue

 Although she does not characterize it as such, Kosakow's principal argument appears to be that there is not an identity of issue between the DHR proceeding and the present proceeding. Kosakow argues that, in the proceedings before the DHR, she had the burden to prove that her termination was not for legitimate reasons, but, under the FMLA, New Rochelle has the burden of establish-

---

7. Because "federal courts must give the [state] agency's factfinding the same preclusive effect to which it would be entitled *in the*

*State's courts," Elliott*, 478 U.S. at 799, 106 S.Ct. 3220 (emphasis added), we apply New York law governing collateral estoppel.

ing that she would have been terminated regardless of whether she was on leave. Consequently, she argues, the determination by the DHR against her does not preclude litigation of that issue in the present case because the burdens of proof are different. She correctly points out that, where the burden of proof is a preponderance of the evidence, the party with the burden of proof would lose in the event that the evidence is evenly balanced. Thus, if the evidence were evenly balanced in the present case, she argues that she would have lost at the DHR, but could still prevail here, and, accordingly, collateral estoppel should not apply.

Kosakow's argument finds some support under New York law. In *Nesbitt v. Nimmich*, 34 A.D.2d 958, 312 N.Y.S.2d 766 (2d Dept.1970), a divided Appellate Division determined that, in certain circumstances, a shift of the burden of proof would prevent the operation of collateral estoppel. The plaintiff and defendant in *Nesbitt* had both been defendants in a prior suit related to the same automobile accident. In the prior suit, Nimmich had been found liable, but Nesbitt had not. Nesbitt subsequently sued Nimmich, and argued that Nimmich was collaterally estopped by the verdict in the prior case from claiming he was not liable. *Id.* at 958–59, 312 N.Y.S.2d at 767–68. The court recognized that, in the first action, if the evidence was evenly balanced with respect to Nesbitt's liability, the plaintiff would have failed to establish by a preponderance of the evidence that Nesbitt was liable. If that were the case, Nesbitt would not have been found liable in the first case, but may still be found to be contributorily negligent in the subsequent case where he is a plaintiff and has the burden of proof.[8] If Nesbitt were found contributorily negligent, Nimmich would prevail in the present case, notwithstanding the previous decision against him.

Accordingly, Nesbitt was not entitled to rely on the prior decision to collaterally estop Nimmich from disputing liability because the prior decision did not necessarily determine that Nesbitt was not contributorily negligent. *Id.* at 959, 312 N.Y.S.2d at 768. This decision was affirmed without opinion by the Court of Appeals. *Nesbitt v. Nimmich*, 30 N.Y.2d 622, 331 N.Y.S.2d 438, 282 N.E.2d 328 (1972).

█ While the *Nesbitt* decision has some appeal, it seems to be in conflict with *Schwartz* and at least one subsequent decision by the New York Court of Appeals. Initially, as recognized by the Appellate Division dissent in *Nesbitt*, the majority's opinion is in tension with the Court of Appeals decision in *Schwartz* decided three years prior. The *Schwartz* opinion counsels that a functional approach should be taken in analyzing collateral estoppel in New York, and that it should not be applied rigidly. *Schwartz*, 24 N.Y.2d at 73, 298 N.Y.S.2d at 962, 246 N.E.2d 725. Notably, under this functional test, the court did not mention the burden of proof, let alone describe it as a dispositive factor. While there is a certain logical appeal to the decision in *Nesbitt*, the value of collateral estoppel in fostering judicial economy and avoiding inconsistent results would be severely compromised if every shift in the burden of proof would make collateral estoppel unavailable. Indeed, the court in *Schwartz* rejected the formalistic argument that there could be no identity of issue where the prior litigation determined negligence vis-à-vis the passengers rather than with respect to the drivers involved in the case at bar. *Id.* at 74–75, 298 N.Y.S.2d at 963, 246 N.E.2d 725. This is so even though the court conceded that there was some small possibility that a jury could reach a different determination with respect to negligence vis-à-vis the drivers.

8. This case was decided before New York adopted a comparative negligence standard.

*Id.* at 74, 298 N.Y.S.2d at 963, 246 N.E.2d 725. The court responded to this argument by pointing out that "in the usual collision accident, this would be most unlikely and the courts may presume such is not the case." *Id.* It follows that the New York Court of Appeals would similarly reject the proposition that collateral estoppel can never be applied where there is a difference in the burden of proof. *Schwartz*'s practical approach to the issue dictates that parties not be permitted to relitigate the same issues, despite differing burdens of proof, where it is evident that burden of proof played little or no role in the prior factual determination.

This conclusion is supported by the subsequent opinion by the New York Court of Appeals in *Gilberg v. Barbieri*, 53 N.Y.2d 285, 441 N.Y.S.2d 49, 423 N.E.2d 807 (1981). Gilberg, an attorney for Barbieri's wife, had previously accused the defendant, Barbieri, of the petty offense of harassment resulting from an altercation between Gilberg and Barbieri. At a nonjury trial, Barbieri was found guilty of the petty offense of harassment for "using physical force against" Gilberg. *Id.* at 289, 441 N.Y.S.2d at 50, 423 N.E.2d 807. Subsequently, Gilberg brought a civil action against Barbieri based on the same incident, and attempted to use the prior guilty finding against Barbieri to collaterally estop him from relitigating his guilt. *Id.* at 290, 441 N.Y.S.2d at 50, 423 N.E.2d 807. The Supreme Court granted summary judgment in favor of Gilberg based on collateral estoppel, and the Appellate Division affirmed. Barbieri then appealed to the Court of Appeals.

Recognizing that collateral estoppel is a "flexible doctrine which can never be rigidly or mechanically applied," the Court of Appeals undertook a thorough analysis of the criminal proceeding, utilizing the factors enunciated in *Schwartz*, to determine whether Barbieri had a full and fair opportunity to litigate his innocence. *Id.* at 292, 441 N.Y.S.2d 49, 423 N.E.2d 807. In so doing, the court considered the "minor" significance of the criminal trial for a petty violation, the lack of a right to a jury trial, the lack of vigor of Barbieri's defense, the fact that Barbieri had no role in choosing the forum, and the lack of any indication that the parties were aware that the determination would be used against Barbieri in later litigation. *Id.* at 292–93, 441 N.Y.S.2d at 51–52, 423 N.E.2d 807.

Notably absent from the opinion in *Gilberg* is any discussion of the differing burdens of proof at the criminal and civil proceedings. The lack of this discussion is especially revealing in light of the fact that the court ultimately held that collateral estoppel should not apply, despite the fact that the higher burden of proof at the petty offense criminal trial would have militated in favor of applying collateral estoppel against Barbieri at the subsequent civil proceeding.[9] Thus, it seems clear that, under New York law, a shift in the burden of proof is not dispositive as to whether collateral estoppel can be applied.

---

9. Moreover, the Court of Appeals has described the doctrines of claim and issue preclusion by stating:

> [I]t is a fundamental principle that "a judgment rendered jurisdictionally and unimpeached for fraud shall be conclusive, as to the questions litigated and decided, upon the parties thereto and their privies, whom the judgment, when used as evidence, relieves from the burden of otherwise prov-

ing, *and bars from disproving*, the facts therein determined."

*Ryan v. New York Tel. Co.*, 62 N.Y.2d 494, 500, 478 N.Y.S.2d 823, 826, 467 N.E.2d 487 (1984) (quoting *Fulton County Gas & Elec. Co. v. Hudson Riv. Tel. Co.*, 200 N.Y. 287, 296–97, 93 N.E. 1052 (1911) (emphasis added)). This would indicate that burden of proof is not necessarily dispositive under New York law, at least not in the rigid sense that it was applied in *Nesbitt*.

Even assuming that a shift in the burden of proof may be dispositive in some cases, however, it would clearly not be so in the present case. This is because the DHR finding of no probable cause was not based on a determination made by a preponderance of the evidence.[10] The DHR determination was simply that there was "no probable cause" to believe that Kosakow's termination was the result of discrimination on the basis of her disability.[11] Moreover, as fully explained below, without any discovery or any type of hearing, it can hardly be said that this determination was made based on a fully developed record. The issue of whether Kosakow could ultimately prove her claims by a preponderance of the evidence was simply not reached. Accordingly, the DHR determination of no probable cause was not tantamount to a determination by a preponderance of the evidence, and, accordingly, Kosakow's argument that a shift in the burden of proof should be dispositive in this case is not persuasive.

The burden of proof issue aside, there appears little doubt that there is an identity of issue in the present case. *Schwartz*, 24 N.Y.2d at 71, 298 N.Y.S.2d at 960, 246 N.E.2d 725. In deciding Kosakow's claim, the DHR made the factual determination that Kosakow was terminated for a legitimate business reason. Spe-cifically, the DHR decision states that "[b]ecause of financial losses incurred by respondent [New Rochelle] measures were taken to reduce expenses including a re-duction in force." The DHR further de-termined that, as the only part-time tech-nician who was not cross-trained in related fields of x-ray certification, Kosakow was terminated. In the present case, if it were determined that New Rochelle terminated Kosakow for financial reasons unrelated to her leave, that termination would not be in violation of the FMLA. *See* 29 U.S.C. § 2614(a)(3)(B) (FMLA only protects rights or positions of employment to which employee would have been entitled had she not taken leave). Consequently, the issue of whether Kosakow was terminated for financial reasons was "necessarily ... decided in the prior action." *Schwartz*, 24 N.Y.2d at 71, 298 N.Y.S.2d at 960, 246 N.E.2d 725. Thus, there is an identity of issue.

### 2. Full and fair opportunity to litigate

We now proceed to the second question: did Kosakow have a full and fair opportunity to litigate this issue? It should be remembered that the burden is upon Kosakow to prove that she did not have a full and fair opportunity to litigate her claims in the DHR proceeding. *See*

---

**10.** This fact also dispenses with the need to address the Secretary of Labor's regulation placing the burden of proof upon the employ-er in an FMLA reinstatement claim. *See* 29 C.F.R. § 825.216(a). Although the validity of this regulation is not challenged on appeal by New Rochelle, it is challenged in an amicus curiae brief submitted by the Equal Employ-ment Advisory Council. Because the regula-tion ultimately has no bearing upon this case, we do not address its validity.

**11.** Under New York law, this determination is not to be made unless it appears "virtually as a matter of law [that] the complaint lacks merit." *Robertson v. New York*, 240 A.D.2d 504, 504, 659 N.Y.S.2d 773, 774 (2d Dept. 1997); *Stasiak v. Montgomery Ward & Co., Inc.*, 66 A.D.2d 962, 962, 411 N.Y.S.2d 700, 701 (3d Dept.1978). Notably, New York courts have not been entirely consistent in describing this standard, occasionally leaving out the word "virtually." *See, e.g., Doin v. Continental Ins. Co.*, 114 A.D.2d 724, 725, 494 N.Y.S.2d 522, 523 (3d Dept.1985); *Mendez v. New York State Human Rights Appeal Bd.*, 96 A.D.2d 1132, 1132, 467 N.Y.S.2d 731, 732 (3d Dept.1983). We need not examine this incon-sistency, however, because, in either event, it is clear that the determination is made by something less than proof by a preponderance of the evidence.

*Ryan v. New York Tel. Co.*, 62 N.Y.2d 494, 501, 478 N.Y.S.2d 823, 827, 467 N.E.2d 487 (1984). In determining whether a party had a full and fair opportunity to litigate the issue, the New York Court of Appeals has instructed that "the various elements which make up the realities of litigation," should be explored, including "the size of the claim, the forum of the prior litigation, the use of initiative, the extent of the litigation, the competence and experience of counsel, the availability of new evidence, indications of a compromise verdict, differences in the applicable law and foreseeability of future litigation." *Schwartz*, 24 N.Y.2d at 72, 298 N.Y.S.2d at 961, 246 N.E.2d 725.

In order to determine if Kosakow had a full and fair opportunity to litigate her claims, the nature of the procedure followed by the DHR in investigating Kosakow's claim must be examined. The DHR proceeding began when Kosakow pro se submitted her complaint to the DHR, a three-page document of factual allegations that she believed described discriminatory conduct on the part of New Rochelle. In response, New Rochelle then submitted its answer, prepared by its attorneys. The thirteen-page response consisted of answers to each of the allegations on Kosakow's complaint, followed by approximately forty pages of attached supporting documents. Kosakow was entitled to, and did, submit a rebuttal. Kosakow's rebuttal was eleven pages, as well as approximately twenty pages of supporting documentation.

Based on these submissions, the DHR conducted an investigation concerning Kosakow's allegations. The record does not make clear what constituted this "investigation." There is no record of any discovery being conducted, nor is there any record of any interviews of witnesses. Moreover, there is no record of any type of hearing or conference being held between the parties. It appears that the no-probable-cause determination was based primarily, if not exclusively, upon a review of the papers submitted.

■ In analyzing the preclusive effect of this proceeding, the factors enunciated in *Schwartz*, as well as additional considerations particular to determining the preclusive effect of administrative agency determinations set forth in *Allied Chem. v. Niagara Mohawk Power Corp.*, 72 N.Y.2d 271, 532 N.Y.S.2d 230, 528 N.E.2d 153 (1988), provide guidance. In *Allied*, the New York Court of Appeals recognized that "[w]hile issue preclusion may arise from the determinations of administrative agencies, in that context the doctrine is applied more flexibly, and additional factors must be considered by the court." *Id.* at 276, 532 N.Y.S.2d at 232, 528 N.E.2d 153. Initially, it must be determined whether the agency has the statutory authority to act adjudicatively. *Id.* In the present case, there is no dispute that the DHR has the authority to adjudicate disputes related to employment discrimination, and to come to binding conclusions with respect to those disputes.

■ Even though the DHR has such authority, however, it must be determined "whether the procedures used in the administrative proceeding assured that the information presented to the agency were sufficient both quantitatively and qualitatively, so as to permit confidence that the facts asserted were adequately tested, and that the issue was fully aired." *Id.* at 276–77, 532 N.Y.S.2d at 232, 528 N.E.2d 153. In making this determination, the factors set forth in *Schwartz* provide a framework for the analysis.

One factor clearly weighs in favor of the application of collateral estoppel. Specifically, it does not appear that any new evidence became available to Kosakow after her DHR complaint was dismissed.

Several other factors appear, at first blush, to support the application of collateral estoppel, but ultimately do not. Initially, while it would seem that the resolution of the issue in the prior litigation was equally important to Kosakow as it is in the present case, she did not have the same incentive and initiative to litigate the issue in both forums. At the DHR hearing, having had no discovery, Kosakow did not have any access to evidence that may have served to refute New Rochelle's claim that it was suffering financial difficulties. In fact, Kosakow did not even attempt to disprove New Rochelle's contention that it had legitimate financial reasons for terminating some employees. Rather, she argued that, even assuming the New Rochelle had legitimate reasons to cut back on staff, the decision to terminate her, as opposed to another worker, was the result of discriminatory bias. Thus, while Kosakow may have had the same motivation to litigate her respective *claims* in both forums, she did not have the ability or motivation to litigate the specific *issue* of New Rochelle's financial reasons for her termination.

Similarly, while it would not seem unreasonable to assume that Kosakow was aware that arguments made at the DHR stage would have an effect on subsequent litigation, this factor must be considered in light of the realities of the prior action. Kosakow was acting *pro se,* and, as such, her understanding of the implications of her decision should not be cavalierly assumed. Furthermore, to the extent her employment discrimination claims were based on the ADA, the determinations of the DHR would have had no effect on subsequent federal litigation. *See Thomas v. Contoocook Valley Sch. Dist.,* 150 F.3d 31, 39 n. 5 (1st Cir.1998); *see also Jones v. New York City Hous. Auth.,* No. 94 Civ. 3364(DC), 1995 WL 736916, at *2 (S.D.N.Y. Dec.13, 1995). Accordingly, there is no reason to believe that Kosakow would have understood that the determinations made by the DHR would prevent her from litigating the same issues in federal court.

The remaining factors set forth in *Schwartz* also weigh in Kosakow's favor. The nature and extent of the DHR proceeding is far less formal than that of the present case. Kosakow did not receive any type of hearing wherein she could confront the witnesses against her. *Compare Ryan,* 62 N.Y.2d at 503–04, 478 N.Y.S.2d at 828, 467 N.E.2d 487. While this is not dispositive—as noted in the prior cases, the Federal Rules of Civil Procedure allow for the dismissal of a case by way of summary judgment without a full hearing, *see, e.g., Mitchell,* 553 F.2d at 270–71—nevertheless, given the informal nature of the evidentiary submissions at DHR, the lack of a full hearing is relevant. *See, e.g., Heinitz v. Standard Constr. Inc.,* 202 A.D.2d 843, 843–44, 609 N.Y.S.2d 102, 103 (3d Dept.1994) (lack of hearing is a relevant consideration).

Moreover, the determination of no probable cause by the DHR was made after review of evidence and written statements by potential witnesses, but Kosakow was not entitled to any discovery prior to this determination. In contrast, she would not be subject to a summary judgment motion in a judicial proceeding until after discovery, including the opportunity to discover contrary documentary evidence and depose the defendant's witnesses. Thus, while there is similarity between the DHR proceeding and a motion for summary judgment under the federal rules, it cannot be ignored that the DHR makes factual conclusions based on a record that is far less developed than that before a federal court.

The final factor from *Schwartz* is whether the party to be estopped was represented by counsel in the prior proceeding. As

noted, Kosakow was acting pro se. For this reason, she could not have been expected or able to frame her evidence within the context of the specific legal issues. Nor would she necessarily have known what facts were most relevant or persuasive in proving her case.

In sum, in analyzing the realities of Kosakow's DHR proceeding under *Schwartz* and *Allied*, we conclude that the issue of whether Kosakow was terminated for legitimate business reasons was not "adequately tested" or "fully aired" at the DHR proceeding. *Allied*, 72 N.Y.2d at 276–77, 532 N.Y.S.2d at 232, 528 N.E.2d 153.[12] Consequently, Kosakow is not collaterally estopped from relitigating that issue in the present case. Accordingly, the district court's decision to the contrary is reversed.

### (4)

### ERISA

The final issue before us is whether the district court erred in dismissing Kosakow's claim for severance pay under ERISA. Initially, New Rochelle challenges the determination by the district court that New Rochelle's promise in its Practice Policy Manual to pay severance pay "where applicable" constituted a "plan" under ERISA. In addition, Kosakow appeals from the determination that she was not entitled to severance pay. Each argument is addressed below.

### a. ERISA plan

New Rochelle's Practice Policy Manual provides that terminated employees will "[r]eceive appropriate severance pay where applicable." New Rochelle argues that this, at most, constitutes a promise of a one-time severance payment, and it should not be considered a severance pay "plan" under ERISA.

A finding that a particular program is a "plan" under ERISA depends in part upon whether that program "requires an ongoing administrative program to meet the employer's obligation." *Fort Halifax Packing Co., Inc. v. Coyne*, 482 U.S. 1, 11, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987). A program that simply pays "a one-time, lump-sum payment triggered by

---

12. Although not raised by New Rochelle, for the sake of completeness of the discussion, one final point warrants discussion. In the context of administrative estoppel, the New York Court of Appeals has also instructed that "a party explicitly soliciting resolution of an issue from an agency, who fully participates in the administrative proceeding which follows with the expectation that all will be bound by the result reached there, may be fairly precluded from relitigating the issue in a subsequent proceeding." *Allied*, 72 N.Y.2d at 277, 532 N.Y.S.2d at 232, 528 N.E.2d 153. As explained in *Allied*, this consideration, along with the others discussed above, is properly seen as part of "the beguilingly simple prerequisite that the administrative decision [is] 'quasi-judicial' in character." *Allied*, 72 N.Y.2d at 276, 532 N.Y.S.2d at 232, 528 N.E.2d 153. Accordingly, courts which have relied upon the party's selection of a forum in determining whether collateral estoppel should apply have done so only where the choice was freely and clearly made with the advice of counsel. *See, e.g., Clemens v. Apple*, 65 N.Y.2d 746, 749, 492 N.Y.S.2d 20, 20, 481 N.E.2d 560 (1985) (plaintiff "freely elected to proceed to arbitration with the assistance of counsel"); *see also American Ins. Co. v. Messinger*, 43 N.Y.2d 184, 191, 401 N.Y.S.2d 36, 40, 371 N.E.2d 798 (1977) (parties entered into arbitration agreement); *Strattner v. Cabrini Med. Ctr.*, 257 A.D.2d 549, 549–50, 682 N.Y.S.2d 594, 594 (1st Dept.1999) (parties subject to arbitration agreement); *Penn Central Corp. v. Consol. Rail Corp.*, 82 A.D.2d 208, 214–15, 441 N.Y.S.2d 266, 271 (1st Dept. 1981) (agreement between parties to submit issue to less formal proceeding). Even if New Rochelle had raised this point, it would seem that New York courts would not extend this principle to an unrepresented party who simply submitted a complaint to the DHR without some indication of a knowledgeable, freely-made choice of forum.

a single event requires no administrative scheme whatsoever to meet the employer's obligation," *id.* at 12, 107 S.Ct. 2211, and is not a "plan" under ERISA. We have concluded similarly that an employer's promise to give sixty days severance pay to all employees who stayed with the company until it ceased operations at the employees' location, at which point they would be terminated, was not a "plan" because it did not require an "ongoing administrative program." *James v. Fleet/Norstar Fin. Group, Inc.*, 992 F.2d 463 (2d Cir.1993) (quoting *Fort Halifax*). While not deciding "which ... factors will be determinative in every case," we have found that "an ongoing administrative program" may exist (1) where an employer's undertaking "requires managerial discretion," that is, where the undertaking could not be fulfilled without "ongoing, particularized, administrative" analysis of each case, *see Bogue v. Ampex Corp.*, 976 F.2d 1319, 1323 (9th Cir.1992); (2) where "a reasonable employee would perceive an ongoing commitment by the employer to provide some employee benefits"; and (3) where "the employer was required to analyze the circumstances of each employee's termination separately in light of certain criteria." *Schonholz v. Long Island Jewish Med. Ctr.*, 87 F.3d 72, 76 (2d Cir.1996).

 Applying the same factors to the case at hand, we conclude that the district court did not err in determining that the severance pay policy in the present case constituted a "plan" under ERISA. Unlike the plan in *James*, the severance payments in the present case are not contingent upon a single event. To the contrary, severance pay in the present case is offered without any apparent date restriction, and thus could reasonably be seen by employees as an ongoing commitment by New Rochelle. *See Schonholz*, 87 F.3d at 76–77. Moreover, like in *Schonholz*, an individual determination must be made as to whether an employee was terminated

for sufficient cause such that she forfeited her severance benefits as the manual provides that if "sufficient cause" exists, an employee can be terminated and will "forfeit all terminal benefits." Finally, the amount of severance is not a fixed amount, and, consequently, the employer would presumably have to determine the amount in each individual case. The combination of these factors leads us to conclude that the district court did not err in holding that New Rochelle's severance pay policy constituted a "plan" under ERISA.

**b. Severance Pay**

The final issue that must be addressed is the district court's affirmation of the plan administrator's determination that Kosakow was not entitled to severance pay under New Rochelle's plan. As noted, New Rochelle's Practice Policy Manual provides that terminated employees will "[r]eceive appropriate severance pay where applicable." The plan administrator determined that severance pay was not applicable in Kosakow's case for three independent reasons: 1) severance pay is only available under the plan where requested by a "shareholder or other management employee" under "special or exceptional circumstances," and no such request was made on Kosakow's behalf; 2) the plan does not provide for severance pay to part-time employees, only full-time employees occupying "supervisory, managerial, administrative, or professional" positions; and 3) at the time of Kosakow's termination, New Rochelle was operating under financial stress which made it impossible to make any severance payments.

 The first question is the appropriate standard of review the district court should have applied in reviewing the administrator's decision. Pursuant to the Supreme Court's decision in *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S.

101, 115, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989), a "denial of benefits . . . is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." In contrast, where a plan does confer discretion upon the administrator to determine eligibility or interpret the terms of the plan, the determinations of the administrator are reviewed under an abuse of discretion standard. *Id.* at 115, 109 S.Ct. at 957. Relying on this authority, as well as several past decisions of this court regarding the conferral of discretion, the district court held, and the parties do not contest, that New Rochelle's plan "does not contain language conferring the kind of broad discretion that post *Firestone* decisions have held could form the basis for a more deferential review." *Kosakow,* 116 F.Supp.2d at 402. Thus, the district court held that the *de novo* standard of review applied in the present case.

 Consistent with its determination that the plan did not confer discretion upon the administrator, the court recognized that, in order to prevail, New Rochelle "must show that the claimant's interpretation of the Plan is unreasonable." *Id.* (citing *Alfin, Inc. v. Pacific Ins. Co.,* 735 F.Supp. 115, 119 (S.D.N.Y.1990)); *see also Masella v. Blue Cross & Blue Shield of Connecticut, Inc.,* 936 F.2d 98, 107 (2d Cir.1991) (in ERISA case, all ambiguities in the plan must be construed against the employer). Finally, the district court correctly recognized that ERISA requires that any "circumstances which may result in disqualification, ineligibility or denial [or] loss of benefits" must be included in the plan. *Kosakow,* 116 F.Supp.2d at 404 (quoting 29 U.S.C. § 1022(b)). Accordingly, the regulations promulgated pursuant to that section require that a plan include "a statement clearly identifying circumstances which may result" in the loss of benefits. *Id.* (quoting 29 C.F.R. § 2520–102–3(1)). The district court's assessment of the law to this point was correct.

After correctly determining that New Rochelle's plan does not confer discretion for *Firestone* purposes upon the administrator, and correctly stating the law applicable under that circumstance, however, the district court went on to review the plan as if the administrator did, in fact, have discretion to determine when severance pay was appropriate. Indeed, the court stated that "the Administrator has broad discretion to make the 'applicability' decision." *Id.* It is not clear how the court arrived at this conclusion, and this statement is not easily reconcilable with the district court's earlier conclusion that the plan "does not contain language conferring the kind of broad discretion that post *Firestone* decisions have held could form the basis for a more deferential review." *Id.* at 402. The only possible explanation that would not render these statements completely contradictory is that the district court found that the plan did not confer discretion upon the administrator to interpret the terms of the plan for purposes of *Firestone* analysis, but the "where applicable" language did confer discretion upon the administrator to make determinations as to eligibility for severance benefits. While *Firestone* and its progeny allow for a plan to make such a distinction, the district court erred in finding that the plan in the case at bar was such a plan.

 The statement that severance benefits will be paid "where applicable" is not sufficient to confer upon the administrator the discretion to decide, as a general matter, who receives severance benefits. As the district court apparently recognized, the plan does not contain any clear language similar to that which, subsequent to *Firestone,* has been found to be sufficient to convey discretionary authority. *See Kosakow,* 116 F.Supp.2d at 402 (col-

lecting cases); *see, e.g., Jordan v. Retirement Comm. of Rensselaer Polytechnic Inst.*, 46 F.3d 1264, 1267–1271 (2d Cir. 1995) (plan that provided that "[t]he Retirement Committee shall pass upon all questions concerning the application or interpretation of the provisions of the Plan" conferred discretionary authority). Although a plan need not contain any "magic words such as 'discretion' and 'deference,'" *Jordan*, 46 F.3d at 1271, it must, nevertheless, give some unambiguous indication that discretion has been conferred. This is especially true where, as in the present case, the administrator does not have discretion to interpret the terms of the plan. Accordingly, the plan in the present case does not confer discretionary authority upon the administrator to determine as a general matter who does or does not receive severance pay. *Cf. Heidgerd v. Olin Corp.*, 906 F.2d 903, 909 (2d Cir.1990) (finding no discretionary authority for award of severance pay despite clause in plan stating "benefits may be payable under other circumstances than those outlined . . ."). Consequently, the administrator's decision not to award severance pay to Kosakow is reviewed under the *de novo* standard. *Firestone*, 489 U.S. at 115, 109 S.Ct. at 956–57.

 Applying the de novo standard of review, the plan must be examined in order to determine whether Kosakow is entitled to severance pay. The district court only purported to apply the *de novo* standard of review. Since we are thus faced not with a question of fact but one of applying the correct standard of review, we are in as good a position as the district court to make the determination. *See United States v. McCombs*, 30 F.3d 310, 328 (2d Cir.1994); *Karavos Compania Naviera S.A. v. Atlantica Export Corp.*, 588 F.2d 1, 8–9 (2d Cir.1978). As noted above, the plan provides that "employees shall . . . [r]eceive appropriate severance pay where applicable." In this connection, the plan also provides that employees who are having problems with performance can be terminated for cause if they fail to correct their performance after being given time to improve. In such a case, the employee may receive severance pay "[i]n lieu of appropriate advance notice" of termination. Additionally, if "sufficient cause" exists, an employee can be immediately terminated (without advance notice), and that employee will "forfeit all terminal benefits." Thus, the plan lists two situations in which severance pay is clearly not "applicable"-where a wayward employee is not able to correct her ways and is given advance notice of termination, or where an employee is terminated for "sufficient cause," such that no notice or severance pay is required.

Kosakow interprets these provisions to imply that in any other situation, severance pay is "applicable." Because there is no dispute that Kosakow's termination was not "for cause," she argues that severance pay was applicable in her case. Under the *de novo* standard of review, New Rochelle must prove that this is an unreasonable interpretation of the plan.

New Rochelle has failed to meet this burden. Initially, it was incumbent upon New Rochelle to specify in the plan the various situations in which severance pay is or is not available. *See* 29 C.F.R. § 2520.102–3(1) (requiring plan to include "a statement clearly identifying circumstances which may result" in loss of benefits). The lack of any guidance, beyond the two situations listed above, as to where severance pay will not be "applicable," could lead a reasonable employee to conclude that in all other situations, severance pay is applicable. Thus, Kosakow's interpretation is not unreasonable, and, pursuant to the *de novo* standard of review, the district court erred in not adopting it. Because no question of fact remains on this issue, the district court's holding with re-

spect to Kosakow's severance pay is reversed and remanded with instructions to order the administrator to calculate Kosakow's severance pay—assuming Kosakow does not prevail on her FMLA claim.

### Conclusion

Because we hold that the district court (1) erred in concluding, as a matter of law, that Kosakow had not alleged facts sufficient to show her eligibility under the FMLA; (2) correctly found that Kosakow may prevent New Rochelle from contesting her eligibility through equitable estoppel; (3) erred in concluding that Kosakow was collaterally estopped from litigating her FMLA claims in federal court; (4) correctly concluded that New Rochelle's severance policy was a "Plan" for the purposes of ERISA; (5) correctly concluded that a court should review the plan administrator's decision under a *de novo* standard; and (6) erred in its application of *de novo* review, we vacate the judgment of the district court and remand for proceedings not inconsistent with this opinion.