Apurba Kumar **BASAK,** Plaintiff,

v.

**NEW YORK STATE DEPARTMENT OF HEALTH and Celeste Johnson (in her individual and official capacities),** Defendants.

No. 13 Civ. 3103(MHD).

United States District Court,
S.D. New York.

Signed March 25, 2014.

Filed March 26, 2014.

Thomas Anthony Ricotta, White, Ricotta & Marks, P.C., Jackson Heights, NY, for Plaintiff.

Todd Alan Spiegelman, New York State Office of the Attorney General, New York, NY, for Defendants.

## MEMORANDUM & ORDER

MICHAEL H. DOLINGER, United States Magistrate Judge.

Plaintiff Apurba Kumar Basak commenced this lawsuit against his employer, the New York State Department of Health ("DOH"), and a senior supervisor at the DOH, Ms. Celeste Johnson. Invoking 42 U.S.C. § 1983 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et. seq.*, he complains of discrimination on the basis of his national origin in the conditions of his employment and retaliation for his complaints about that discrimination, culminating in his demotion in 2012 after approximately 34 years of service. His complaint may also be read to assert claims of disability and age discrimination.

Defendants have moved to dismiss some or all of the complaint on a host of grounds. First, they assert that plaintiff's Title VII claims are time-barred insofar as they are premised on events predating September 6, 2011. Second, they argue that his claims of national-origin discrimination and retaliation should be dismissed under Rule 12(b)(6) as implausible. Third, they contend that his § 1983 claims are barred by collateral estoppel based on findings by the State Division of Human Rights. Finally, they hypothesize that plaintiff might be asserting claims of age or disability discrimination under § 1983, and they argue that such claims should be dismissed because they are precluded by the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et al.*, Plaintiff, of course, opposes the motion.

### I. *The Nature of Plaintiff's Claims*

In plaintiff's complaint he describes himself as "a 65 year old man of East Indian descent" and states that he "suffers from loss of total vision of right eye." (Compl. ¶ 8). According to plaintiff, he began employment with DOH in 1978, when he was hired as a Regional Medical Care Administrator (grade 22). He reports that he was promoted in 1985 to Associate Medical Care Administrator (grade 25). (*Id.* ¶¶ 9, 10). In 1997, he alleges, he began to serve as Regional Coordinator for the Office of Professional Medical Conduct ("OPMC"). Then in 1999 he was appointed Acting Director for the New York State Medicaid Program. (*Id.* ¶¶ 12–13). Subsequently,

in 2004 and 2006, Basak was promoted, respectively, to the position of Manager of Complaint Investigation for the Long Term Care Program (grade 27) and to the position of Regional Program Director for OPMC. (*Id.* ¶¶ 14, 15).

Plaintiff recounts that for all of these assignments he was located at the New York City office of DOH. (*Id.* ¶¶ 9, 10, 12–13). He further alleges that through this entire period he performed very effectively. (*Id.* ¶¶ 16–17).

The events of which plaintiff now complains are said to have begun in November 2010 when defendant Johnson, the Regional Director of DOH, called him to a meeting with her and Regional Personnel Director Ellen Poliski, and told him that he was being transferred to the New Rochelle Office "and that his younger, less experienced deputy ... would assume the responsibilities of the New York City office as part of a 'Succession Planning'" by DOH. Plaintiff reports that he protested the move, as he lived a considerable distance away, in Warren, New Jersey, and the commute would compel him to drive at least four hours a day, a notable hardship in view of his partial blindness. He alleges that he asked for an accommodation, and that his request was denied, with Ms. Poliski saying "that's your problem". (*Id.* ¶¶ 18–19).

Basak was transferred to New Rochelle on or about December 10, 2010. (*Id.* ¶ 21). The professional organization (or union) to which he belonged—which he refers to as the Office of Management Confidential Employees ("OMCE")—wrote to the DOH Commissioner protesting the transfer. In response the Commissioner's office sent a letter to OMCE reiterating that the transfer was "for 'Succession Planning'". (*Id.* ¶¶ 22–23).

Plaintiff alleges that subsequently Johnson engaged in insulting comments that betrayed a hostility to his national origin. Specifically, on February 8, 2011, he attended a meeting with her and one of his own subordinates. During the course of the meeting, Basak objected to something that Johnson had said, and she responded angrily that "she was speaking English," and asked Basak, apparently rhetorically, whether "he understands English." According to Basak, he speaks with an East Indian accent, and hence he interpreted this comment as a slur. (*Id.* ¶ 24). He further alleges, in vague terms, that Ms. Johnson had made a comparable comment some months earlier in the presence of two of Basak's deputies. (*Id.*).

Plaintiff goes on to state that, in the wake of Johnson's remark, he made a formal in-house complaint of national-origin discrimination to Betsy Alberti, the DOH Director for the Bureau of Employee Relations/Staff Development. His complaint apparently bore at least modest fruit. He recites that the Human Resources Manager subsequently told him that Ms. Johnson had been advised of the complaint and instructed not to engage in retaliatory measures. (*Id.* ¶¶ 25–26).

According to plaintiff, despite this instruction he was subsequently subjected to "a pattern of retaliatory actions." (*Id.* ¶ 26). He alleges that Johnson, Poliski and the DOH Deputy Director of Downstate OPMC all began calling him at home, falsely accusing him of fraud and inadequate investigation of complaints handled by his department. (*Id.* ¶ 27). He reports that he again complained to Ms. Alberti but "the retaliation ... persisted." (*Id.* ¶ 28). Thus, he says, he was notified in November 2011 of an investigation into suspected misconduct by him, and he was interrogated on December 19, 2011 by a William Bevilacqua, Senior Investigator, Employee Relations, who accused him of falsifying his time records. (*Id.* ¶ 29). Ac-

cording to plaintiff, despite the bogus nature of this accusation, on February 2, 2012 he was called to a meeting and informed that his appointment as Assistant Director of Professional Misconduct was being terminated as of February 8, 2012. As a result he was demoted to Health Program Administrator 3, with the functional title of Assistant Manager of Complaint Investigation. This demotion lowered his civil service slot by four grades and cost him about $20,000.00 in annual base salary. (*Id.* ¶¶ 30–31).

In the wake of this demotion, on July 2, 2012, plaintiff filed a charge with the New York State Division of Human Rights ("SDHR"). (*Id.* ¶ 32). Although a copy of the charge is not attached to the complaint, in that document Basak complained of discrimination, in violation of the New York State Human Rights Law, on the basis of age, disability, national origin, race and color, and he also alleged retaliation. (Spiegelman Decl. Ex. B at 1, 9). The SDHR issued a finding of no probable cause on December 28, 2012, and plaintiff filed his original complaint in this court on May 8, 2013.

## II. *Assessment of Defendants' Motion*

We address each of the defendants' arguments for dismissal in the order in which they present them. For reasons that follow, we conclude that the motion must be granted in part.

### A. *The Limitations Defense: Title VII National Origins Claim*

Defendants first focus on plaintiff's claim for national-origin discrimination, arguing that it is time-barred. We agree in part.

There is no dispute that the limitations period under Title VII for claims filed with a state agency is 300 days from the alleged wrongful act. 42 U.S.C. § 2000e–5(e)(1). *See, e.g., Patterson v. Cnty. of Oneida,* 375 F.3d 206, 220 (2d Cir.2004). Plaintiff filed with the SDHR on July 2, 2012 (Am. Compl. ¶ 32), thus establishing a limitations cut-off of September 5, 2011.[1]

Defendants assert that the one set of acts predating September 2011 that plaintiff alleges was discriminatory consisted of Ms. Johnson's queries as to whether plaintiff understood English, conduct that allegedly took place in February 2011 and some months earlier. Characterizing this set of allegations as the only pled basis for the plaintiff's claim of national-origin discrimination, defendants assert that the claim in its entirety must be dismissed. (Defs.' Mem. at 7–8).

■ There is no question that plaintiff cannot assert a national-origin discrimination claim predicated on these alleged incidents. They are plainly time-barred. Moreover, the complaint is devoid of any allegation that the subsequent actions of defendants were motivated by national-origin animus. Rather, the plaintiff is very explicit in labeling all of them—including the accusatory telephone calls, the charges against him of misconduct, and his demotion—as acts of retaliation following his complaint to Ms. Alberti in February 2011. (Am. Compl. ¶¶ 26–31).

Defendants' timeliness argument falls short in one respect, however, since plaintiff is purporting to assert a claim of national-origin discrimination under § 1983 as well as under Title VII. The statute of limitations that governs such claims is three years, *e.g., Patterson,* 375 F.3d at

---

1. Defendants' count is slightly different, leading them to posit September 6 as the cut-off. (Defs.' Mem. at 7). This difference of one day is immaterial.

225, and hence this version of the national-origin claim is timely.

### B. *Plausibility of the National–Origin and Retaliation Claims*

Defendants next move, pursuant to Rule 12(b)(6), to dismiss plaintiff's claims for national-origin discrimination and retaliation. In substance, they argue that neither set of claims is plausible and hence that plaintiff has failed to state a cognizable claim. We agree in part.

#### 1. *Legal Criteria*

We start by noting the stringency of the standard that the movant must meet in order to obtain dismissal for failure to state a claim. "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *abrogated on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *accord, e.g., Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 476 (2d Cir.2006) (*per curiam*). In assessing such a motion, the court must assume the truth of the well-pled factual allegations of the complaint and must draw all reasonable inferences against the movant. *See, e.g., Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 337 (2d Cir.2006); *Still v. DeBuono*, 101 F.3d 888, 891 (2d Cir.1996).

 To survive a Rule 12(b)(6) motion to dismiss, a complaint must set forth factual allegations that, if credited, make the claims at least "plausible." *See Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 560–70, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). When addressing a Rule 12(b)(6) motion, the court may not consider evidence proffered by the moving party. Rather, it is limited to reviewing the four corners of the complaint, any documents attached to that pleading or incorporated in it by reference, any documents that are "integral" to plaintiff's allegations even if not explicitly incorporated by reference, and facts of which the court may take judicial notice. *See, e.g., ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir.2007); *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir.2007); *Leonard F. v. Isr. Disc. Bank*, 199 F.3d 99, 107 (2d Cir.1999).

#### 2. *The National–Origin Claim*

As noted, the only acts that plaintiff cites in his complaint as reflecting animus to his national origin are comments by Ms. Johnson, assertedly made on two occasions, questioning whether plaintiff understood English. Defendants argue that this claim fails for lack of any pleading (1) that plaintiff was subjected to an adverse employment action as a result of the alleged animus and (2) that any such actions suggested the presence of such prohibited animus based on plaintiff's national origin. (Defs.' Mem. at 8–10).

 Since the Title VII claim for national-origin discrimination is time-barred, the only basis for a national-origin discrimination claim would be one asserting a violation of equal protection under the Fourteenth Amendment, a claim that could be pressed under § 1983 as against Ms. Johnson in her individual capacity. It is not available as against the DOH since (1) § 1983 permits suits only against "person[s]", a term that does not encompass the states or their agencies, *see, e.g., Will v. Mich. Dep't of Police*, 491 U.S. 58, 62–71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989), and (2) the Eleventh Amendment bars such claims against the states or their agencies. *See, e.g., Feingold v. New York*, 366 F.3d 138, 149 (2d Cir.2004) (citing *Pennhurst State Sch. & Hosp. v. Halder-*

*man*, 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984); *Quern v. Jordan*, 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979)). The question remains, however, whether plaintiff pleads a "plausible" equal-protection claim against Ms. Johnson. We conclude that he does not.

■■■ An aggrieved public employee may assert discrimination claims against a decision-maker under the Equal Protection Clause that may be equivalent to claims potentially available under Title VII, but, in doing so, he may be required to prove additional elements not imposed by the statute. Most notably, a plaintiff pressing a discrimination claim under § 1983 and the Fourteenth Amendment must demonstrate that the discrimination was intentional. *See, e.g., Reynolds v. Barrett*, 685 F.3d 193, 201 (2d Cir.2012). Nonetheless, as our Circuit Court has observed, "[m]ost of the core substantive standards that apply to claims of discriminatory conduct in violation of Title VII are also applicable to claims of discrimination in employment' in violation of ... the Equal Protection Clause." *Patterson*, 375 F.3d at 225 (citing cases); *cf. Sanchez–Vazquez v. Rochester City Sch. Dist.*, 519 Fed.Appx. 63, 64 (2d Cir.2013).

Given this parallelism, we note that the elements of plaintiff's Equal Protection claim for national-origin discrimination must encompass both national-origin animus by Ms. Johnson, and a resultant adverse employment action. As for pleading standards, defendants seem to argue that plaintiff must allege factual details that could demonstrate all of the elements of a *prima facie* showing under Title VII, and they urge that he has failed to do so, particularly with respect to animus and adverse employment action.

The requirements for pleading a Title VII discrimination claim—and by extension an Equal Protection claim for employment discrimination—have undergone some massaging over the last dozen years. Historically, some courts, including our circuit, required that the plaintiff articulate with sufficient specificity each of the elements of a discrimination claim, accompanied by factual allegations supportive of each element. *E.g., Tarshis v. Riese Org.*, 211 F.3d 30, 35–36, 38 (2d Cir.2000). In 2002, however, the Supreme Court held that a Title VII or ADEA complaint may pass muster without detailed pleading of facts that would support a *prima facie* case, and that the required level of detail was controlled by Rule 8(a), which mandates a "short and plaint statement" of the claim. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *see, e.g., Boykin v. KeyCorp.*, 521 F.3d 202, 212–13 (2d Cir.2008) (*Swierkiewicz* applies generally to disparate-treatment claims). That said, the Supreme Court in its 2007 decision in *Twombly* and then in 2009 in *Iqbal* imposed a plausibility standard on Rule 12(b)(6) analysis, and that requirement applies to all civil pleadings, including—notably—disparate-treatment claims, as exemplified in *Iqbal. See* 556 U.S. at 666, 675–83, 129 S.Ct. 1937.

■■ The net result is that the complaint must contain sufficient factual matter to "permit the court to 'infer more than the mere possibility of misconduct' "; rather, the court must be able "to draw a reasonable inference that the defendant is liable for the misconduct alleged", *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir.2009), and in doing so it must conduct its evaluation through a " 'context specific' inquiry." *Kajoshaj v. N.Y.C. Dep't of Educ.*, 543 Fed.Appx. 11, 15–16 (2d Cir.2013) (quoting *Iqbal*, 556 U.S. at 679, 129 S.Ct. 1937). To permit the court to draw the required reasonable inference, " 'a plaintiff must allege facts that allow the court in substance to infer elements of a *prima facie* case.' "

*Mohawk v. William Floyd Sch. Dist.*, 2014 WL 838162, *2 (E.D.N.Y. March 3, 2014) (quoting *King v. U.S. Sec. Assocs.*, 2012 WL 4122025, *5 (S.D.N.Y. Aug. 22, 2012) (citing cases)); *accord, e.g., Fernandez v. City of New York*, 2012 WL 2402642, *3–4 (S.D.N.Y. June 26, 2012) (dismissing § 1981 & 1983 claims for failure to plead adverse employment action). Here plaintiff's national-origin discrimination claim plainly fails that test.

■ As noted, the only allegation of national-origin discrimination pertains to what plaintiff identifies as two instances of Ms. Johnson purportedly insulting him by asking whether he understood English (Am. Compl. ¶ 24), one of which he alludes to in passing and in such general terms as to leave the reader in the dark as to what occurred. (*Id.*) (referring to "similar comments months before"). As for the more specifically described February 2011 incident, the pleading avers that Ms. Johnson's comment was made in response to plaintiff disagreeing with something that she had just said, and was preceded by her statement that "she was speaking English".

At least as described in the Amended Complaint, it is not at all clear that the comment at issue evidences national-origin animus on the part of Ms. Johnson,[2] but, in any event, plaintiff fails to plead any foundation for proving that such animus triggered any adverse employment action.

■ Adverse employment actions must involve significantly concrete disadvantages imposed on the employee as conditions of his employment. *See, e.g., Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640–42 (2d Cir.2000) (citing cases). Plaintiff, however, pleads nothing more than the assertedly insulting remark by Johnson that he paraphrases. Such comments, whether laced with discriminatory animus or simply hurtful or offensive, do not themselves amount to an adverse employment action. *See, e.g., Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 570 (2d Cir.2012); *King*, 2012 WL 4122025 at *8 (citing cases).

Although plaintiff goes on to allege subsequent actions by defendants that could more readily amount to adverse employment actions—notably his demotion, apparently based on a charge of misconduct regarding time records[3]—the complaint alleges specifically that these actions were in the nature of retaliation for his February 2011 complaint to Human Resources about Ms. Johnson's comments. (Am. Compl. ¶¶ 26–31). Moreover, apart from the specificity of that repeated assertion of

2. The comment does not explicitly reference plaintiff's Bengali national origin, but could be read to do so implicitly. We take judicial notice of the fact that the DOH's response to plaintiff's complaint to the SDHR admitted that "Ms. Johnson was counseled that she needs to demonstrate sensitivity to cultural and racial issues in her dealings with her staff and others, and that her statement to the Complainant was inappropriate." (Spiegelman Decl. Ex. C p. 8). In any event, the ethnic connotations of such a comment would presumably turn on the manner and the context in which the comment was made, and plaintiff does not elaborate on the circumstances—other than to note that he speaks English with a non-native accent—that might lead a fact finder to conclude that Ms. Johnson was derisively referencing his national origin.

3. Plaintiff also alleges that after his initial complaint to Human Resources, Ms. Johnson and others made phone calls to him at home during which they articulated groundless accusations of misconduct. (Am. Compl. ¶ 27). He does not allege that these calls involved anything more than oral accusations, and he does not assert that they led to any concrete action by the DOH until he was formally accused of misconduct regarding his time records, which allegedly led to his demotion. (*Id.* ¶¶ 29–30)

a retaliatory motive, plaintiff pleads no facts that would suggest a nexus between those later actions and national-origin animus on the part of Ms. Johnson.

In sum, plaintiff fails to plead a cognizable claim—whether under Title VII or under § 1983—for national-origin discrimination. That claim is therefore dismissed.

### 3. *The Retaliation Claim*

 Plaintiff seeks also to pursue a claim under Title VII for employer retaliation.[4] He asserts that within one month after his February 2011 complaint to Ms. Alberti about Ms. Johnson's assertedly discriminatory remarks and after Human Resources had apparently advised her of his complaint and warned her against retaliation (allegedly in March 2011), she began to retaliate. He alleges that the retaliation began with a series of harassing phone calls by Ms. Johnson and others under her command—calls made to plaintiff at his home, falsely accusing him of various misdeeds. He further reports (1) that he again complained to Human Resources, this time about the phone calls, although he does not specify when, and (2) that the retaliation continued. (Am. Compl. ¶¶ 27–28).

As for what specifically occurred following his second complaint to Human Resources, plaintiff does not allege a continuation of the phone-call campaign, but rather recites that in November 2011 he received a letter from DOH advising him that he was to be "interrogated" about alleged "professional misconduct" and that this "interrogat[ion]", by a Senior Investigator from Employee Relations, took place on December 19, 2011. (*Id.* ¶ 29). He further asserts that the allegations in question—apparently having to do with misuse of time records—were false and retaliatory in motivation, and that they led to his demotion from his then-current position in February 2012. (*Id.*).

In seeking dismissal of this claim on the basis of lack of "plausibility", defendants press two arguments. First, they assert that the alleged phone-call campaign does not constitute an adverse action sufficient to satisfy the requirements of a claim under Title VII (or presumably the First Amendment). Second, they argue that the later, more concrete actions—specifically, plaintiff's demotion in February 2012— took place so long after the assertedly protected conduct of Basak as to preclude his satisfying the causation requirement for a plausible retaliation claim. (Defs.' Mem. at 12–13).

 To state such a claim under Title VII, the plaintiff must allege (1) that he participated in a so-called protected activity, (2) that his participation was known to the employer, (3) that the employer undertook an action that was materially adverse to the plaintiff, and (4) that there was a causal connection between the adverse action and the protected activity. *See, e.g., Burlington Northern & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 70, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006); *Kelly v. Howard I. Shapiro & Assocs.,* 716 F.3d 10, 14 (2d Cir.2013); *Hicks v. Baines,* 593 F.3d 159, 169 (2d Cir.2010). It bears emphasis that the adverse action need not be a step that alters the terms, conditions or status of plaintiff's employment. As the Supreme Court noted in *Burlington,* "[t]he scope of the antiretaliation provision extends beyond workplace-related or employment-related retaliatory acts or harm." 548 U.S. at 67, 126 S.Ct. 2405. Whatever

---

4. Plaintiff states in his opposition that he is not asserting a retaliation claim under § 1983. (Pl. Mem. 1 n. 1).

the nature of the adverse conduct by the defendant, "[the] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it might well have "dissuaded a reasonable worker from making or supporting a charge of discrimination."'" *Id.* at 67–68, 126 S.Ct. 2405 (quoting *Rochon v. Gonzales,* 438 F.3d 1211, 1219 (D.C.Cir.2006); *Washington v. Ill. Dep't of Revenue,* 420 F.3d 658, 662 (7th Cir.2005)). The Court went on to emphasize that "the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters." *Id.* at 69, 126 S.Ct. 2405. Thus the Court observed that a change in an employee's work schedule "may make little difference to many workers, but may matter enormously to a young mother with school-age children." *Id.* Similarly, while not inviting an employee to lunch may, in some circumstances be trivial, exclusion from training lunches that might contribute significantly to the employee's advancement could dissuade some from pressing a complaint. *Id.* Hence the assessment must necessarily be very fact-specific, since "[t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Id.* (quoting *Oncale v. Sundowner Offshore Sevs., Inc.,* 523 U.S. 75, 81–82, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)).

With these concerns in mind, we conclude that the retaliation claim is not subject to dismissal on the face of the pleading, as defendants contend. First, the initial form of alleged retaliation—repeated assertedly abusive phone calls to plaintiff at his home, involving false accusations of workplace misconduct or miscues—might, depending on the details and context, be viewed as sufficiently intimidating to cause a reasonable employee to hesitate or desist from filing future complaints of discrimination. Second, even if the phone-call campaign in itself were not deemed sufficiently adverse to have this deterrent effect on a reasonable employee, it could nonetheless be viewed by a reasonable trier of fact as indicative of a retaliatory animus, since it was assertedly unorthodox and hostile, and it apparently occurred reasonably soon after plaintiff pressed his initial discrimination complaint with Human Resources. Since there is no real question that defendants ultimately undertook more concrete adverse actions against plaintiff—in the form of accusations of serious misconduct, followed by a formal investigation and then his demotion—the pleading appears to lay out a sufficient basis for opening discovery addressed to the question of retaliatory animus.

Apart from arguing that the assertedly hostile telephone critiques of plaintiff in mid–2011 did not amount to cognizable adverse action, defendants press the further contention that there is no basis to infer retaliatory animus from the late–2011 and early–2012 investigation of alleged wrongdoing and the culminating demotion of Mr. Basak. This attack on the plausibility of the retaliation claim rests on the argument that too much time had passed between plaintiff's protected activity in complaining to Human Resources in about February 2011 and the alleged concrete adverse actions by defendants, which assertedly occurred many months later. We find this mode of reasoning to be unpersuasive for several reasons.

First, defendants ignore the fact that, according to the complaint, plaintiff made several complaints to Human Resources, starting in February 2011, but extending beyond that time. Although plaintiff's pleading in this court does not detail the

dates of plaintiff's subsequent Human Resources complaints, defendants have proffered his verified SDHR complaint, which specifies a written complaint of harassment to Human Resources as late as July 2011. (Spiegelman Decl. Ex. B at pp. 4–5).[5] Thus, even if we ignore the asserted retaliatory conduct between February and July, the start of the investigation that led to plaintiff's demotion was only four months after plaintiff's more recent protected activity. *See, e.g., Summa v. Hofstra Univ.,* 708 F.3d 115, 127–28 (2d Cir. 2013) (discussing *Espinal v. Goord,* 558 F.3d 119, 129 (2d Cir.2009 & citing cases)) (Second Circuit has found sufficient proof of causation based on adverse acts four, six and eight months after protected activity).

Second, although defendants imply that the lapse of months between the Human Resources complaints and the demotion is so long as to preclude an inference of retaliatory animus, that inference is one properly drawn or rejected on an evidentiary record that reflects all pertinent circumstances rather than on a motion addressed to a pleading. Indeed, most of the court decisions that have assessed the inference based on the timing of the retaliatory act have done so in the context of a Rule 56 motion. *See, e.g., Summa,* 708 F.3d at 127–28 (citing cases). In this case, that is particularly apt since, as we have noted, plaintiff has alleged not only the retaliatory acts of formally investigating and then demoting him, but also a pattern of prior conduct that—even if not of sufficient seriousness to amount to a materially adverse act—can be read as at least circumstantial evidence of retaliatory animus.

Third, defendants ignore the fact that the inference of animus may be based solely on circumstantial evidence. *See, e.g., Hicks,* 593 F.3d at 170. As we note, the complaint pleads a series of aggressive actions by defendants that closely followed plaintiff's first Human Resources complaint, and evidence supporting that narrative can be viewed as circumstantial evidence of retaliatory animus.

In sum, we deny summary judgment on the Title VII retaliation claim.

### III. Collateral Estoppel

■ Defendants next seek dismissal of all claims insofar as plaintiff asserts them under § 1983. The premise for their application is that plaintiff pressed the same claims and factual contentions before the SDHR, which rejected them on the merits in a written decision, concluding that there was no probable cause to sustain them. Accordingly, defendants contend, collateral estoppel precludes the assertion of those claims here. Plaintiff opposes solely on the basis that plaintiff did not have a full and fair opportunity to litigate these claims before the SDHR.

■ It is settled law that preclusion by collateral estoppel of a § 1983 claim based on a state agency finding of no probable cause—not subsequently affirmed by a court—turns on whether that finding would be preclusive in state court. *See, e.g., University of Tenn. v. Elliott,* 478 U.S. 788, 798–99, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986); *Kosakow v. New Rochelle Radiology,* 274 F.3d 706, 728–29 (2d Cir.2001).[6] Under New York law, applica-

---

5. The agency complaint is presumably integral to plaintiff's pleading of claims, and is referred to in that pleading. (Am. Compl. ¶ 3).

6. There is no question that if the agency decision was upheld on direct review by a state court, its holding could collaterally estop the claimant from asserting a comparable § 1983 claim. *See, e.g., Kosakow,* 274 F.3d at 727–28. It is equally clear that an unreviewed agency decision cannot preclude a claim under Title VII. *E.g., Elliott,* 478 U.S. at 796, 106 S.Ct. 3220.

tion of collateral estoppel depends upon whether there is an "identity of issue which has necessarily been decided in the prior action and is decisive of the present action" and whether the party against whom estoppel is sought had "a full and fair opportunity to contest the decision now said to be controlling." *Schwartz v. Public Admin.*, 24 N.Y.2d 65, 71, 298 N.Y.S.2d 955, 960, 246 N.E.2d 725 (1969). The party asserting the collateral estoppel defense has the burden of demonstrating identity of issues, and the party against whom preclusion is sought has the burden to demonstrate a lack of a full and fair opportunity to litigate the issues. *Id.* at 73, 298 N.Y.S.2d at 962, 246 N.E.2d 725.

There is no dispute that the SDHR—though confronted with claims under state law—necessarily decided the very issues that plaintiff is seeking in substance to pursue here under § 1983 and that his federal claims rest on the same factual grounding as he presented to the agency. (*See* Spiegelman Decl. Exs. B–E). It is equally plain that the agency's findings and conclusions, contained in its Determination and Order After Investigation, are fatally inconsistent with plaintiff's current factual contentions and claims. (*Id.* Ex. E). Thus defendants satisfy the identity-of-issues requirement. *See generally Kosakow*, 274 F.3d at 730–34 (discussing New York cases that define a liberal "functional approach" to identity assessment).

The more difficult question is whether plaintiff's contention that he was denied a full and fair opportunity to litigate is sustainable. We conclude that the record before us does not demonstrate that plaintiff had the requisite full and fair opportunity before the SDHR.

 The New York Court of Appeals has offered general guidelines in assessing whether a party has had an adequate opportunity in a prior lawsuit to litigate his claims. The court should consider "the various elements which make up the realities of litigation", including "the size of the claim, the forum of the prior litigation, the use of initiative, the extent of the litigation, the competence and experience of counsel, the availability of new evidence, indications of a compromise verdict, differences in the applicable law and foreseeability of future litigation." *Schwartz*, 24 N.Y.2d at 72, 298 N.Y.S.2d at 961, 246 N.E.2d 725. The application of these criteria in this case must take account of the fact that the prior proceeding was not before a court, but rather before the SDHR, which in many circumstances offers only circumscribed procedures for evaluating a complaint filed with it. *See, e.g., Kosakow*, 274 F.3d at 734. Of particular note, when the question is the preclusive effect of an agency decision, "in that context, the doctrine is applied more flexibly, and additional factors must be considered by the court." *Allied Chem. v. Niagara Mohawk Power Corp.*, 72 N.Y.2d 271, 276, 532 N.Y.S.2d 230, 232, 528 N.E.2d 153 (1988). Thus, apart from assessing whether the agency has the authority to adjudicate disputes of the nature involved in the second proceeding, the court must determine "whether the procedures used in the administrative proceeding assured that the information presented to the agency was sufficient both quantitatively and qualitatively, so as to permit confidence that the facts were adequately tested, and that the issue was fully aired." *Id.* at 276–77, 532 N.Y.S.2d at 232, 528 N.E.2d 153.

In arguing that he lacked an adequate opportunity to litigate, Basak emphasizes the foreshortened nature of the proceedings before the SDHR, which seem to have involved the submission of the parties' respective written statements of their respective versions of the facts and the SDHR's finding of no probable cause, with

an explanation that found a lack of credible evidence developed by an unspecified "internal investigation". (Pl. Mem. at 13). In contrast, defendants emphasize that plaintiff was a fairly high-level DOH official with administrative responsibilities that should have apprised him of how best to support his charges before the SDHR if they had any merit. (Defs.' Mem. at 15–19; Defs.' Reply Mem. at 9–10).[7]

This form of assessment is certainly not formulaic, and requires the court, on a case-by-case basis, to balance a number of potentially competing considerations. In doing so, we rely in substantial measure on the analysis of the Second Circuit in *Kosakow*, and in particular on the contrasts between the circumstances found there—in which the Court held that plaintiff had lacked a fair and full opportunity to litigate—and those recited in *DeCintio v. Westchester Cnty. Med. Center*, 821 F.2d 111, 117 (2d Cir.1987), which came to an opposite result.

In *DeCintio*, the Second Circuit reviewed the evidentiary record created on a summary-judgment motion and held that the administrative procedures that had been afforded the plaintiff following his suspension and termination for disciplinary reasons had satisfied the requirement of a full and fair opportunity to litigate and, thus, estopped his § 1983 retaliation claim. However, in notable contrast to the case before us, DeCintio had undergone both an administrative evidentiary hearing pursuant to § 75 of the New York Civil Service Law—where retaliation was an available ground for him to assert—and a proceeding before the SDHR, all while represented by counsel. *See id.* at 113. The analy-

sis of the Court emphasized the adequacy of the opportunity to participate in the § 75 hearing, even though DeCintio had apparently "not … availed himself significantly of that opportunity". *Id.* at 116.

As for the SDHR proceeding—which led to a no-probable-cause finding—it included DeCintio's written charge, the response of the Medical Center, as well as further "fleshing out" of the facts by the parties by way of affidavits, and an "actual [ ] investigat[ion]". *Id.* at 117. Emphasizing DeCintio's admission that he had " 'fleshed out' the issues at the SDHR hearing," the Court held that this proceeding, together with the hearing held under § 75, satisfied the collateral-estoppel requirement of a full and fair opportunity to litigate the retaliation claim. *Id.* at 117–18. In so holding, the Court observed that, under New York law, "[o]nly where the record indicates 'that there was a thorough inquiry during which the complainant was afforded a full opportunity to present her contentions,' or where a complaint 'lacks merits as a matter of law' will an SDHR dismissal based on lack of probable cause be upheld." *Id.* (quoting *Flah's Inc.*, 71 A.D.2d at 993, 420 N.Y.S.2d at 284).

In *Kosakow*, the plaintiff had been terminated after taking leave under the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2901 *et seq.*, and she then filed a *pro se* charge of disability discrimination with the SDHR. Based on her submission, the written response of the employer and her reply, and "after an investigation of the matter", the SDHR found no probable cause, a determination from which Kosakow did not seek review in state court. *Kosakow*, 274 F.3d at 713. Instead, she

7. Defendants do not argue, nor could they reasonably do so, that plaintiff's charge lacked merit as a matter of law, and hence the issue for the court at this stage is limited to whether plaintiff was afforded a full and fair opportunity to litigate his facially adequate claim before the SDHR. *See, e.g., Flah's Inc. v. Schneider*, 71 A.D.2d 993, 993, 420 N.Y.S.2d 283, 284 (2d Dep't 1979).

sued in federal court, claiming a violation of the FMLA.[8] On a motion for summary judgment, defendant invoked, *inter alia*, a collateral-estoppel defense premised on the SDHR's no-probable-cause determination. *Id.* at 727.

In assessing this question, the Court initially noted that an SDHR determination on a controlling factual question, if reviewed by a court, would estop a plaintiff asserting a federal claim, but that an unreviewed agency determination, even if undertaken in a judicial capacity, required a somewhat different analysis, under which the preclusive effect of the agency's ruling would generally turn on state law governing preclusion, unless otherwise provided by the relevant federal law. *Id.* at 727–28 (discussing *Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982); *Elliott*, 478 U.S. 788, 106 S.Ct. 3220).

Since the FMLA did not purport to affect the normal applicability of state preclusion law, the Circuit Court directly addressed the effect of an SDHR finding under New York law. Having found an identity of issues between what had been presented to the SDHR and Kosakow's claims in federal court, the Circuit panel focused on the question of the adequacy of Kosakow's opportunity to litigate before the SDHR. Noting that she bore the burden of proof on this issue, the Court summarized the relevant criteria under *Schwartz*—including the flexibility of the governing standards when applied to an unreviewed agency decision, *id.* at 733–34—and then proceeded to hold that plaintiff had not been afforded the requisite opportunity.

The Court first noted that it was necessary to examine "the nature of the procedure followed by the SDHR in investigat-

ing Kosakow's claim ..." *Id.* at 734. It reported the initial submission by plaintiff of a three-page complaint, followed by a lengthy rebuttal by the Medical Center, which included thirteen pages of responses to Kosakow's allegations and 40 pages of supporting documentation, and finally Kosakow's reply, which included an eleven-page response and 20 pages of supporting documentation. *Id.* As recounted by the Court, the SDHR had conducted an investigation "[b]ased on these submissions", although the record did not reflect the details of that investigation. The Court emphasized that there was no record evidence that any discovery had been undertaken, or that the SDHR had interviewed witnesses or conducted any hearing or conference. The panel observed, "[i]t appears that the no-probable-cause determination was based primarily, if not exclusively, upon a review of the papers submitted." *Id.*

The Court did note one factor favoring estoppel—that no new evidence had come to light after the SDHR proceeding—but concluded that the balance of pertinent factors cut the other way. *Id.* at 734–36. In doing so, it highlighted at least four considerations undercutting estoppel. First, the Court held that Kosakow had lacked the means or motivation before the SDHR to contest the company's claim that her termination had been financially based—a conclusion that was based in part on the lack of discovery in the SDHR proceeding. *Id.* at 735. Second, as a *pro se* litigant, the plaintiff may not have fully appreciated the potential impact of an adverse SDHR decision on her prospects in future litigation and, furthermore, as a non-lawyer "she could not have been expected or able to frame her evidence with-

---

8. Plaintiff also asserted a claim under the Employee Retirement Income Security Act. 29 U.S.C. § 1001 *et seq. Kosakow*, 274 F.3d at 714.

in the context of the specific legal issues" and would not "necessarily have known what facts were most relevant or persuasive in proving her case." *Id.* at 735–36. Third, the panel observed that the SDHR proceedings had been informal, with no opportunity for Kosakow to confront witnesses, a factor which was deemed to be of particular significance "given the informal nature of the evidentiary submissions." *Id.* at 735. Lastly, before the SDHR made its decision based on its review "of evidence and written statements by potential witnesses", it had not provided Kosakow any opportunity to obtain discovery (such as document production or depositions), and this had resulted in what the Court characterized as "a record that is far less developed than that before a federal court". *Id.*

The same considerations that barred application of estoppel to Kosakow's claim are, in large measure, present here as well. First, defendants' motion is one for a Rule 12 dismissal, rather than summary judgment, and contains no specific evidence as to the extent of the SDHR proceedings. What we can glean from defendants' papers makes reasonably clear that the only written submissions were the two proffers by plaintiff of his account and the submission of a response by defendant that includes some documentary exhibits but no witness statements. It is also apparent (1) that plaintiff lacked the means to challenge in any depth the assertion by the defendants that their treatment of him was motivated by business considerations rather than retaliatory animus, (2) that he was appearing *pro* se, which presumably handicapped his ability to present a meaningful case in ways comparable to those that affected Ms. Kosakow, (3) that the SDHR

did not afford him any hearing to confront witnesses and quite possibly did not afford him any conference, (4) that he was given no opportunity for discovery, (5) that the record reviewed by the SDHR (unlike in *Kosakow*) appears not to have included any witness statements, and (6) that the review by the SDHR was therefore presumably limited to a record even more sparse than that in *Kosakow.*

In resisting these conclusions, defendants seem to rely principally on the assertion that Basak was sophisticated because he was a fairly senior management person in DOH. (Defs.' Mem. at 10).[9] This is hardly a basis for distinguishing *Kosakow.* The Court there did not assess the level of sophistication of the *pro se* litigant before the SDHR, simply referring to her as a "radiological technologist", *id.* at 713, and the panel made it clear that the most significant considerations involved the lack of meaningful opportunities for the claimant to develop and present her case other than in the most rudimentary form, and that her status as a *pro se* litigant before the SDHR reinforced these concerns. For reasons noted, those circumstances were true here as well, indeed in even more extreme form, in view of the complete absence of witness statements. Moreover, defendants ignore the fact that lack of legal training and skills is likely to be found even in senior managerial personnel, and they offer no factual basis to infer that plaintiff—who is obviously a lay person— was, nonetheless, in a position to surmount the procedural limitations of the proceeding before the SDHR.

In sum, we conclude that on the current record the plaintiff's § 1983 claims are not barred by collateral estoppel premised on the no-probable-cause decision of the

---

9. Defendants also assert that Basak "had access to union representation." (*Id.*). There is no evidence in the record that he was in fact represented by a union officer or by anyone else for that matter in the SDHR proceeding.

SDHR. *See, e.g., Smith v. City of New York,* 2008 WL 1970316, *8 (S.D.N.Y. May 6, 2008); *Jeter v. N.Y.C. Dep't of Educ.,* 549 F.Supp.2d 295, 305 (E.D.N.Y.2008) (citing cases); *Vargas v. City of New York,* 2008 WL 361090, **4 & n. 5 (S.D.N.Y. Feb. 11, 2008); *Lloyd v. N.Y. Botanical Garden,* 2004 WL 2093468, *2–4 (S.D.N.Y. Sept. 17, 2004); *see Richards v. Calvet,* 2005 WL 743251, *9–12 (S.D.N.Y. March 31, 2005) (citing cases) (applying same analysis to reject estoppel effect of EEOC no-probable-cause decisions); *Kempkes v. Marvin,* 2008 WL 5330673, *7 n. 3 (S.D.N.Y. Dec. 19, 2008) (distinguishing *DeCintio* ). *Compare Macer v. Bertucci's Corp.,* 2013 WL 6235607, *3–6 (E.D.N.Y. Dec. 3, 2013) (plaintiff afforded discovery and an evidentiary hearing by SDHR); *Johnson v. Cnty. of Nassau,* 411 F.Supp.2d 171, 180–82 (S.D.N.Y.2006) (plaintiff had been represented by counsel before SDHR).

## IV. *The Section 1983 Claims Based on Age or Disability Animus*

Defendants' remaining argument is that if the complaint is read to attempt to state § 1983 claims for discrimination on the basis of age or disability, those claims must be dismissed since the only cognizable claims for such discrimination must be asserted under the ADEA and the ADA. Plaintiff specifically disavows that he is asserting a claim premised on age discrimination. (Pl. Mem. 1 n. 1). He does not respond to defendant's argument concerning disability and we therefore infer that he is not purporting to assert such a claim.

## CONCLUSION

For the reasons stated, defendants' motion to dismiss is granted in part. We dismiss plaintiff's claims of national origin discrimination under both Title VII and § 1983. We deny defendants' motion inso-

far as it seeks dismissal of plaintiff's Title VII claim for retaliation. We deem the complaint not to be asserting claims under § 1983 for discrimination on the basis of age or disability.

Because it is conceivable that plaintiff might be able to state viable claim for national-origin discrimination, we dismiss that claim with leave to replead it. If plaintiff intends to do so, he is to serve and file an amended pleading by no later than April 18, 2014.